12-432-cv
Ricciuti v. Gyzenis

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2015

(Argued: March 9, 2016                    Decided: August 24, 2016)

Docket No. 12-432-cv

_____

REBECCA RICCIUTI,

*Plaintiff-Appellee*,

v.

GARRY GYZENIS, EMILE GEISENHEIMER,
DAVID SMITH, LAWRENCE MOON,
EDWARD KRITZMAN, ROBERT NOLAN,
TOWN OF MADISON,

*Defendants-Appellants*.

_____

Before: LEVAL, POOLER, and WESLEY, *Circuit Judges*.

Appeal from a December 28, 2011 order of the United States District Court

for the District of Connecticut (Kravitz, *J.*), denying defendants' motion for

summary judgment. The district court held that police officials were not entitled to summary judgment of qualified immunity on plaintiff's claim that they retaliated against her for protected speech in violation of the First Amendment. We affirm.

Affirmed and remanded.

_____

SCOTT M. KARSTEN, West Hartford, CT, *for Defendants-Appellants*.

GOUTAM U. JOIS, Gibson Dunn & Crutcher LLP (Matthew D. McGill, James A. Macleod, *on the brief*), New York, NY; Norman Pattis, Pattis Law Firm, LLC, New Haven, CT, *for Plaintiff-Appellee*.

POOLER, *Circuit Judge*:

According to Rebecca Ricciuti, something was amiss at the Madison Police Department. Supervisors were assigning themselves unnecessary overtime to "pad their pensions," all while the department was in dire need of new equipment that it could not afford. After Ricciuti spoke to local leaders about what she saw as a "scam," the police chief ordered an internal affairs investigation of her. Two months later, she was fired.

Ricciuti sued the Town of Madison, its acting chief of police, and members of its police commission, alleging that she was fired for exercising her First Amendment right to free speech. Defendants moved for summary judgment, arguing, among other things, that the police officials who fired Ricciuti were entitled to qualified immunity. The district court (Kravitz, *J.*), held that the officials had not shown entitlement to summary judgment of qualified immunity because, accepting Ricciuiti's facts as true and drawing all permissible factual inferences in her favor, she had shown that they had violated her clearly established constitutional rights. *Ricciuti v. Gyzenis*, 832 F. Supp. 2d 147, 168 (D. Conn. 2011). Accepting Ricciuti's facts as true, as we must on this interlocutory appeal, we agree with the district court that defendants have not shown entitlement to summary judgment of qualified immunity. Accordingly, we affirm and remand the case for trial.

## BACKGROUND

Shortly after receiving her master's degree in forensic science, Rebecca Ricciuti was hired as a patrol officer in the Madison Police Department. Early on, Ricciuti expressed concerns about a number of issues that she saw in the

3

department. In Ricciuti's view, officers were conducting improper interrogations, mishandling evidence, and inadequately trained to use their firearms. The department also needed new equipment—police cruisers had "mismatched snow tires, broken radios, . . . unsafe prisoner cages, high mileage, broken air conditioning, and broken radar unit[s]." App'x at 272.

One day, Ricciuti expressed her concern about the outdated equipment to a lieutenant. He told Ricciuti that the department couldn't afford to purchase new equipment because the money was needed to pay overtime to department supervisors. On her own initiative, Ricciuti then drafted a new schedule that would have cut down on the amount of overtime that was needed, thereby saving the department money that could have been used to purchase new equipment. But when Ricciuti presented the schedule to the lieutenant, he told her that scheduling was "none of [her] business" and that he needed the overtime to "pad [his] pension." App'x at 271. Ricciuti says that, "as a taxpayer in Madison," she was "disgusted by the amount of money being spent on unnecessary overtime." App'x at 272.

Ricciuti raised her concerns about the department's schedule at a meeting with the new chief of police, Robert Nolan. The chief told Ricciuti that he was open to suggestions on how to improve the schedule. Ricciuti teamed up with another officer, Scott Pardales, to draft a "New Schedule Proposal"—a 17-page document that identified problems with the current schedule and proposed several reforms. App'x at 291-307. One of the pages addressed "overtime considerations," App'x at 305, but nothing in the presentation addressed the issue of supervisors assigning themselves unnecessary overtime at taxpayer expense.

Separately, Ricciuti and Pardales prepared a second document, which the parties refer to as the "overtime matrix." App'x at 309-319. The matrix showed the schedule of the department's supervisors and noted the number of days during the week when a supervisor's shift was "vacant," requiring that another supervisor work overtime to cover the shift. The matrix included a series of slides titled "Cost to Town as Result of Mismanagement of Supervisor's Schedule," which calculated in detail the amount of taxpayer money that was being wasted due to mismanagement. App'x at 311-14. In total, the matrix

5

estimated that, in 2008, Madison taxpayers spent at least $100,000 for unnecessary overtime for supervisors.

Ricciuti contends that she prepared the overtime matrix on her own time and on her own initiative. No one at the police department asked Ricciuti to look into mismanagement of the supervisor schedule. Unlike the new schedule proposal, the overtime matrix did not bear the Madison Police Department logo, and Ricciuti never presented it to department supervisors. She contends that all of the information in the matrix was public information and that past schedules of supervising officers and staffing levels were easily accessible through a Freedom of Information Act request.

Ricciuti and Pardales shared the matrix with local political leaders. Pardales met with Madison First Selectman Al Goldberg, the chief executive and chief administrative officer of the town of Madison, as well as a member of the town's Board of Finance, to present the matrix. Ricciuti e-mailed the matrix to a former town official, writing, "Here is the file that I put together. . . . Hopefully [Pardales's] meeting with Goldberg opens the door to this scam." App'x at 67. Ricciuti also called Walter Lippmann—a Madison resident, vocal critic of the

police department, and frequent attendee of Police Commission meetings—and gave him a copy of the matrix. Like Ricciuti, Lippmann had been researching the issue of overtime at the department and was concerned about the amount of money that Madison was spending on overtime wages.

One week after Ricciuti met with Lippman, Chief Nolan e-mailed all members of the department to remind them of their duties to follow department standards of conduct, particularly those regarding "Malicious Gossip," "Divulging Information," and "Dissemination of Information." App'x at 52 ¶ 71. Shortly thereafter, Chief Nolan asked a lieutenant to conduct an internal affairs investigation of Ricciuti. The lieutenant testified that he was assigned to investigate Ricciuti because "[t]here was a matrix that was out in the public" and there were blogs and e-mails circulating that were critical of the department. App'x at 155.

Two months after Chief Nolan initiated the investigation, he met with Ricciuti twice to discuss her job performance. At the second meeting, a dispute arose over the presence at the meeting of a lieutenant whom Ricciuti disliked and distrusted. Ricciuti told Chief Nolan that she was uncomfortable having their

conversation in the lieutenant's presence. According to Ricciuti, Chief Nolan then said that he would check with the police board about whether someone besides the lieutenant could attend another meeting the following day. According to Nolan, Ricciuti unilaterally terminated the meeting, which he viewed as insubordinate and unacceptable.

Chief Nolan says that he reported Ricciuti's behavior to the police commission, which then voted unanimously to fire her. The commission did not provide a reason for its decision. According to Chief Nolan, the Commission fired Ricciuti because of her conduct at the second meeting. According to Ricciuti, however, the Commission fired her in retaliation for speaking out about corruption at the department.

Ricciuti sued the Town of Madison, its acting chief of police, and members of its police commission, alleging that they unlawfully retaliated against her for speech that was protected by the First Amendment. Defendants moved for summary judgment, arguing that Ricciuti's speech was not protected because she had spoken as an employee addressing private workplace grievances, that Ricciuti would have been fired even had she not spoken out, and that her speech

8

was more disruptive than valuable. The individual defendants also argued that they were entitled to qualified immunity because their conduct was not prohibited by clearly established law at the time of Ricciuti's termination.

The district court denied the motion. *See Ricciuti v. Gyzenis*, 832 F. Supp. 2d 147 (D. Conn. 2011). The court concluded that, resolving all ambiguities and drawing all permissible inferences in favor of Ricciuti, Ricciuti's speech was protected under the First Amendment, a reasonable juror could conclude that there was a causal connection between the speech and her termination, and there were genuine issues of material fact on the question whether the speech was more disruptive than valuable. The court also concluded that the individual defendants were not entitled to qualified immunity because "the law was sufficiently clear in 2009 that a government employer should have known [with respect to Ricciuti's disputed version of the facts] that it could not fire an employee because she spoke out as a citizen about a matter of public concern." *Ricciuti*, 832 F. Supp. 2d at 165.

Defendants now appeal the district court's denial of qualified immunity.

9

**DISCUSSION**

Ordinarily, we lack jurisdiction to review the denial of a motion for summary judgment. *See* 28 U.S.C. § 1291; *Walczyk v. Rio*, 496 F.3d 139, 153 (2d Cir. 2007). Under the "collateral order" doctrine, however, there is an exception to this general rule "when the denied motion was based on a claim of immunity, at least to the extent the immunity claim presents a 'purely legal question.'" *Walczyk*, 496 F.3d at 153 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

> [D]efendants may appeal from denials of qualified immunity if they are willing, for the purposes of appeal only, to pursue the appeal on the basis of stipulated facts or the facts as alleged by the plaintiff. Alternatively, the defendants may appeal if they assume that all the facts that the district court found to be disputed are resolved in the plaintiff's favor. While we may not inquire into the district court's determination that there was sufficient evidence to create a jury question, we may resolve whether, as a matter of law, the defendants are entitled to qualified immunity either because the law was not clearly established or because, on the facts assumed for the purposes of appeal, the defendants' conduct did not constitute a violation of a constitutional right.

*Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 104-05 (2d Cir. 2006) (citation omitted), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008); *see also Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014).

10

"We review *de novo* a decision by a district court to deny summary judgment on the basis that a public official is not entitled to qualified immunity." *Golodner*, 770 F.3d at 201. The Supreme Court has articulated a two-prong test to determine whether an official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"The Supreme Court has long recognized that the First Amendment affords a degree of protection to public employees to exercise the right of free speech without risk of retaliation by the State employer if the employee's speech in question is 'on matters of public interest.'" *Lynch v. Ackley*, 811 F.3d 569, 577 (2d Cir. 2016) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

> Recognizing both that public employees do not relinquish the First Amendment rights they would otherwise enjoy as citizens simply because of their public employment, and that government could not function if every employment decision became a constitutional

11

> matter, courts try to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Nagle v. Marron*, 663 F.3d 100, 106 (2d Cir. 2011) (citations and internal quotation marks omitted).

In pursuit of this balance, the Supreme Court has identified three circumstances in which public employee speech is not protected from retaliation:

> First, speech about *personal* matters, as opposed to "matters of public concern," is not protected from retaliation. *Connick v. Myers*, 461 U.S. 138, 147 . . . (1983). Second, even speech on matters of public concern is not protected from retaliation unless the employee's First Amendment interests outweigh government employers' legitimate interests in efficient administration. *Pickering*, 391 U.S. at 568 . . . . Third, speech made by employees "pursuant to . . . official duties" rather than "as a private citizen" is not protected from retaliation. *See Garcetti* [*v. Ceballos*, 547 U.S. 410, 421-22 (2006)].

*Lynch*, 811 F.3d at 578 (footnote omitted).

Before *Garcetti*, to determine whether public employee speech was protected from retaliation, courts focused on the two-step inquiry outlined in *Pickering*. *See, e.g.*, *Melzer v. Bd. of Educ.*, 336 F.3d 185, 193 (2d Cir. 2003). Under the "*Pickering* test," the court "first . . . determine[d] whether the speech which led to an employee's discipline relate[d] to a matter of public concern;

12

and, second, if so, the balance between free speech concerns [was] weighed against efficient public service to ascertain to which the scale tips." *Id.*

In *Garcetti*, the Court made clear that even if a public employee's speech relates to a matter of public concern, and even if the speech passes the *Pickering* "balancing" test, the speech may nevertheless lack protection from retaliation if it was made "pursuant to [the employee's] official duties," rather than "as a private citizen." 547 U.S. at 421-22. The plaintiff in *Garcetti*, a deputy district attorney named Ceballos, had prepared a memo recommending that a case be dismissed in light of inaccuracies in an affidavit used to obtain a search warrant. *Id.* at 413-14. The parties stipulated that Ceballos had prepared the memo pursuant to his employment duties. *Id.* at 424. According to the Court, the "controlling factor" in the case was that the attorney's "expressions were made pursuant to his duties as a calendar deputy." *Id.* at 421. The Court explained,

> Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. . . . The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. Contrast, for example, the expressions

13

made by the speaker in *Pickering*, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day.

*Id.* at 421-22 (citation omitted).

As noted, on defendants' motion for summary judgment of qualified immunity, the district court ruled that, if all disputed facts were resolved in Ricciuti's favor, defendants would not be entitled to summary judgment of qualified immunity. On appeal, defendants challenge the district court's ruling on two grounds, both relating to the scope of *Garcetti*.

First, defendants argue that the district court's ruling must be vacated because the court relied heavily on this Court's decision in in *Weintraub v. Board of Education*, 593 F.3d 196 (2d Cir. 2010), which had not yet been decided at the time of the defendants' challenged actions. In *Weintraub*, we ruled that an employee's speech can be found to be within the scope of the employee's duties within the meaning of *Garcetti* when it is "part-and-parcel" of the employee's general work, even if the employee's job duties did not explicitly call for such speech. Defendants contend that *Garcetti*'s scope, as perceived by the district

14

court, was not "clearly established" when defendants acted and therefore cannot be the basis for a decision in Ricciuti's favor.

Because *Weintraub* was issued after defendants fired Ricciuti, defendants rightly note that they could not have relied on that decision in deciding whether to fire Ricciuti. But while the district court appropriately relied on *Weintraub*'s gloss on *Garcetti* in determining whether Ricciuti established the violation of a constitutional right, the court did not rely on *Weintraub* in determining whether that right was clearly established at the time of the defendants' conduct. On that question, the court relied exclusively on *Garcetti* and pre-*Garcetti* case law, which clearly established that Ricciuti could not be fired simply because her speech owed its existence to her employment. Thus, defendants are not entitled to qualified immunity simply because they did not have the benefit of our decision in *Weintraub* at the time of their actions.

A further problem with defendants' argument is that it relies on their version of the facts, not Ricciuti's. Unlike the plaintiff in *Garcetti*, Ricciuti does not concede that she prepared the overtime matrix pursuant to her official duties. Instead, she vigorously disputes the issue, insisting that no one asked her to

15

create the matrix, that she made it on her own time, and that the matrix contained only public information. Moreover, unlike the plaintiff in *Garcetti*, Ricciuti communicated her concerns to members of the public and contacted local leaders to push for reform, just as a private citizen exercising her First Amendment rights would do. Defendants, of course, dispute these facts. They dispute, for example, that the matrix contained only public information, noting that Ricciuti stated in her deposition that she relied in part on information contained in a clipboard chart posted in a sergeant's private office. But the district court concluded that the evidence proffered by Ricciuti on this issue— including an affidavit by a former police officer stating that the information contained in the matrix was public and available through Freedom of Information Act requests—was sufficient to create a genuine issue of material fact. *Ricciuti*, 832 F. Supp. 2d at 166. And on this interlocutory appeal, we "may not inquire" into whether "there was sufficient evidence to create a jury question." *Skehan*, 465 F.3d at 105. We *must* accept that "all the facts that the district court found to be disputed are resolved in the plaintiff's favor." *Id*. Under Ricciuti's version of the facts, there was no doubt that under the prevailing

16

decisions, Ricciuti's speech (accepting her version of the facts) was not made "pursuant to" her official duties as a patrol officer.

Defendants' second argument fares no better. It is based on our court's decision in *Taravella v. Town of Wolcott*, 599 F.3d 129 (2d Cir. 2010), that "even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Id.* at 134 (alteration in original) (internal quotation marks omitted)); *see also Walczyk*, 496 F.3d at 154 ("Even if the right at issue was clearly established in certain respects, . . . an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Defendants contend that because Ricciuti's speech owed its existence to her employment, it was "reasonable" of the defendants to believe their conduct was lawful under *Garcetti*. *Taravella*'s arguable creation of an additional "reasonableness" hurdle a plaintiff must satisfy to prevail in a suit against a

17

public officer alleging a constitutional tort has not been without controversy. *See Taravella*, 599 F.3d at 136-48 (Straub, *J.*, dissenting); *Walczyk*, 496 F.3d at 165-71 (Sotomayor, *J.*, concurring).

We need not resolve whether the "reasonableness" of a defendant-officer's belief that his conduct did not violate the law is an independent basis for granting qualified immunity, over and above lack of clarity in the law, because, in any event, on the factually disputed record presented to the district court on the defendants' motion for summary judgment, the obligation to resolve factual disputes in the plaintiff's favor compelled a denial of the defendants' motion for summary judgment on the basis of qualified immunity.

As we have explained above, no reasonable officer faced with Ricciuti's version of the facts could have concluded that Ricciuti's speech was made "pursuant to" her official duties as a patrol officer under the meaning of *Garcetti* merely because her speech owes its existence to her job. Defendants therefore failed to show entitlement to fire Ricciuti or entitlement to qualified immunity under her version of the facts. The law on this issue was clearly established at the

18

time Ricciuti was fired, even though our decision in *Weintraub* had not yet been issued. Thus, defendants' conduct was not "objectively legally reasonable."

Defendants offer only one additional consideration as to why their actions were objectively legally reasonable: they note that Ricciuti was a probationary, at-will employee. But it has been clearly established for decades that the government may not retaliate against even an "at-will" employee for protected speech. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972), *overruled on other grounds by Rust v. Sullivan*, 500 U.S. 173 (1991).

> For at least a quarter-century, th[e] [Supreme] Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech.

*Id.* Thus, the fact that Ricciuti was a probationary employee is irrelevant, and no officer of reasonable competence could believe otherwise. It follows that, at least on Ricciuti's version of the facts, defendants failed to show that their conduct was objectively legally unreasonable.

## CONCLUSION

For the foregoing reasons, the order of the district court is AFFIRMED and REMANDED for trial.