EBEL, J., dissenting.
Plaintiff Paul Knopf claims his government boss, Evanston's Mayor Kent Williams, declined to reappoint Knopf as City planner in retaliation for Knopf engaging in speech protected by the First Amendment. I would affirm the district court's decision to deny the Mayor qualified immunity from Knopf's damages claim at the summary-judgment stage of this litigation. My conclusion is contrary to both of the other opinions in this case.
I would, in particular, not require for purposes of the qualified-immunity analysis that Knopf identify factually on-point precedent that clearly established that the speech in which Knopf engaged-sending an email to the City attorney expressing concern about the possible misuse of City money in a greenway development project-fell outside the scope of Knopf's job duties as City planner, which is the first prong of the Garcetti/ Pickering [1] test. This initial predicate inquiry in the five-part Garcetti/ Pickering analysis that applies to Knopf's First Amendment claim turns, not on the defendant's alleged misconduct, but instead on the legal question of the precise and nuanced job duties required of Evanston's planner.
There was only one Evanston planner with Knopf's job duties and responsibilities, so to require him to come up with preexisting precedent clearly establishing his job duties is not only impractical-it is in fact not possible. Requiring Knopf to come up with such precedent before he can defeat a qualified-immunity defense is to tell Knopf, and countless other government employees with unique jobs, that they have been disenfranchised from being able to assert their constitutional rights-here, First Amendment rights-against their employer. A government employee like Knopf will rarely, if ever, be able to identify a prior Supreme Court or Tenth Circuit case holding that a person with his particular job title and his same accompanying duties, engaging in the same speech under similar circumstances, was acting beyond the scope of his unique job duties.
Instead, I would apply clearly established general principles derived from Supreme Court precedent-from Lane v. Franks, --- U.S. ----, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014), and Garcetti, 547 U.S 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) -to determine whether the government employee's speech fell outside the scope of his job duties. Of course, on the other four Garcetti/ Pickering inquiries, I *958 do agree that there has to be prior factually relevant precedent to defeat qualified immunity. But I believe that requirement is satisfied here.
I. Relevant analysis summarized
In Lane, the Supreme Court stated:
[T]he First Amendment protection of a public employee's speech depends on a careful balance "between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public service it performs through its employees."
134 S.Ct. at 2374 (quoting Pickering, 391 U.S. at 568, 88 S.Ct. 1731 ) (alteration omitted). To address this balancing, we apply the five-part Garcetti/ Pickering analysis, asking
(1) whether the speech was made pursuant to the employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.
Helget v. City of Hays, 844 F.3d 1216, 1221 (10th Cir. 2017) (quotation omitted).
To determine whether Knopf has established a constitutional violation, I apply these five Garcetti/ Pickering factors substantively to conclude that Knopf has alleged and sufficiently supported a claim that the Mayor violated the First Amendment by not reappointing Knopf as City planner because of Knopf's email to the City attorney. In reaching that conclusion, I disagree with Judge Briscoe's concurrence at the third step in the Garcetti/ Pickering analysis. Contrary to her concurrence, I would conclude that weighing Knopf's free-speech interest against his government employer's interest in an efficient workplace, the balance tips in Knopf's favor because he was speaking as a whistleblower about possible wrongdoing by City officials and Knopf raised his concerns internally, which was less disruptive than if Knopf made his concerns public.
I then address the qualified-immunity question-whether the First Amendment violation at issue here was clearly established at the time the Mayor refused to reappoint Knopf City planner. Contrary to both my colleagues in the majority opinion, I conclude that, although there must be a prior case that clearly establishes the First Amendment violation under Garcetti/ Pickering's factors two through five, I would not require a prior case that clearly establishes, at the first Garcetti/ Pickering inquiry, that an employee in Knopf position would have been speaking outside the scope of his job duties when he sent an email to the City attorney, another City department head, complaining about the possible misuse of city money in a development project that the person in Knopf's position was not overseeing.
The analysis that follows, then, requires some redundancy in discussing the five Garcetti/ Pickering inquiries because those factors are relevant both to determine, substantively whether Knopf has established a First Amendment violation and to determine whether the First Amendment violation was clearly established at the time of the Mayor's challenged conduct.
II. Knopf established a triable First Amendment claim on the underlying claim
The first question is whether Knopf sufficiently established a claim that the Mayor *959 violated the First Amendment. To answer that substantive question, I apply the five Garcetti/ Pickering inquiries.
A. Garcetti/ Pickering steps one, two and three
The first three steps of the Garcetti/ Pickering test involve legal conclusions for the court to make. See Helget, 844 F.3d at 1222.
Step one inquires whether the government employee was speaking within the scope of his official duties. See id. at 1221. The First Amendment does not protect speech that is part of the employee's job. See Garcetti, 547 U.S. at 421, 126 S.Ct. 1951. Here, however, the record establishes that Knopf sent his email to the City attorney as a citizen, acting outside the scope of Knopf's official or ordinary job duties as a city employee.[2] Judge Briscoe, in her concurrence, reaches the same conclusion. As her concurrence notes, Knopf did not have any specific responsibilities for the construction of the development project at issue here, he did not have general oversight responsibilities for other City department heads, and Knopf sent his email about his concerns that City money was being misused to the City attorney, who was outside Knopf's chain-of-command, just as any citizen might have done.
Step two inquires whether the government employee was speaking on a matter of public concern. See Helget, 844 F.3d at 1221. Here, no one disputes that Knopf's email addressed a matter of public concern.
Step three requires the court to balance the government employee's constitutionally protected interest in speaking as a citizen on a matter of public concern against the government employer's interest in promoting the efficiency of the public service that the government provides. See id. I part ways with Judge Briscoe's concurrence at this third step and agree instead with the district court that, as a legal matter, Knopf's interest in speaking as a citizen regarding the possible misuse of City money on the greenway development project outweighs the City's interest in efficient public service, at least insofar as such interest might be impaired by Knopf's email.
On the employee's side of the scale, Knopf's free-speech interest is entitled to "greater weight" here because his email concerned the possibility of government corruption or wrongdoing. Id. at 1223. "Disruptions in ... working relationship[s]" and "general disharmony in the office[ ] are foreseeable consequences when an employee reports improper activities of coworkers or supervisors." Conaway v. Smith, 853 F.2d 789, 797-98 (10th Cir. 1988) (per curiam). Because of
the vital interest the public has in the integrity of those who administrate their government[,] ... [i]t would be anomalous to hold that because the employee's whistle blowing might jeopardize the harmony of the office or tarnish the integrity of the department, the law will not allow him to speak out on his perception of potential improprieties or department corruption.
Id. at 798 (internal citations omitted). For this reason, I am not persuaded, as the concurrence is, that the Mayor's need to trust his department heads and the need for the City's department heads to get along outweigh Knopf's interest in speaking as a citizen on the possible misuse of City money, a concern that implicated the *960 City engineer, who was the subject of Knopf's email, and implicated the Mayor as well.
The weight on the employer's side of the scale is diminished, not only because Knopf was speaking about the possibility of wrongdoing by City officials, but also because Knopf only directed his concerns internally to the City attorney, rather than making his concerns public, which could have been far more disruptive to the City workplace. See Helget, 844 F.3d at 1223 ; Conaway, 853 F.2d at 798 ; cf. Rock v. Levinski, 791 F.3d 1215, 1216 (10th Cir. 2015) (concluding school principal's free speech interest in speaking publicly against school district's decision to close principal's school was outweighed by school district's "concern that those holding high-ranking policy positions speak publicly with a single voice on policy matters"). Moreover, the matters Knopf addressed in his email were not confidential; they had been discussed at an earlier public meeting.
Although the Mayor asserts that Knopf should have sent the email to the Mayor, who was Knopf's supervisor, a citizen speaking on such a matter of public concern would not have been relegated to communicating only with the Mayor. Instead, the City attorney would have been available and an appropriate official to receive and act upon such a citizen complaint about the possible misuse of City funds. The City attorney, after all, had responsibility for City contracts, under which the alleged misuse of City funds at issue here was occurring. In light of these facts, I conclude as a matter of law that Knopf's First Amendment right to speak as a citizen on a matter of public concern-the possible misuse of City money-outweighed the City's interest in efficient government.
B. Garcetti/ Pickering steps four and five
While the first three Garcetti/ Pickering inquiries involve legal conclusions for the court, steps four and five instead involve questions of fact. See Helget, 844 F.3d at 1222. Step four requires a determination of whether the protected speech was a motivating factor in the adverse employment decision, while step five asks whether the employer would have reached the same adverse employment decision absent the government employee's protected speech. See id. at 1221. Here, the district court determined that Knopf had sufficient evidence to permit a reasonable jury to find for him on both of these questions. We lack jurisdiction, in this interlocutory appeal from the denial of qualified immunity, to review the district court's determinations as to the sufficiency of the evidence on these two questions. See Johnson v. Jones, 515 U.S. 304, 307, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).
Therefore, I conclude, as the district court did, that Knopf sufficiently established a First Amendment claim that, on the merits, was sufficient to survive the Mayor's summary-judgment motion. The qualified-immunity question, which I address next, is whether Knopf's claimed First Amendment violation was clearly established at the time the Mayor refused to reappoint Knopf City planning director.
III. For qualified-immunity purposes, this First Amendment violation was clearly established when the Mayor declined to reappoint Knopf as City planner
Even if a reasonable jury could find that the Mayor violated Knopf's First Amendment rights, the Mayor is entitled to qualified immunity and, thus, will not be liable for damages, unless the First Amendment right the Mayor violated was clearly established *961 at the time he refused to reappoint Knopf City planner. See Dist. of Columbia v. Wesby, --- U.S. ----, 138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018). Generally, "[i]n this circuit, to show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Farrell v. Montoya, 878 F.3d 933, 937 (10th Cir. 2017) (internal quotation marks omitted). This clearly-established inquiry again requires consideration of the five Garcetti/ Pickering factors.
A. Garcetti/ Pickering step one qualified-immunity analysis: It would have been clear to a reasonable person in the Mayor's position that Knopf's email was outside the scope of his government job duties
Although, as just mentioned, ordinarily to defeat a qualified-immunity defense, the plaintiff must identify a case clearly establishing the unconstitutional nature of the defendant government official's challenged conduct, I would not require, as the majority does, that Knopf locate a factually on-point case clearly establishing that a city department head, like Knopf, would be acting outside the scope of his job duties, analogous to Knopf's employment responsibilities, if he sent an email to the City attorney, a co-equal city department head, complaining about the misuse of city money in a development project that the person in Knopf's position was not overseeing. The fact of the matter is that a senior government employee will rarely, if ever, be able to find such a close factually analogous prior case addressing whether a person with his same job title and responsibilities, employed by the same employer or one with a closely similar job description and employment duties and reporting responsibilities, engaging in the particular speech at issue, was acting outside the scope of his or her official or ordinary job responsibilities as those job responsibilities were both legally and factually applied to this particular plaintiff. Even if a plaintiff-employee could somehow find a prior case addressing the job responsibilities of his exact or closely comparable government position, whether speech undertaken in a particular case fell outside his job duties as applied would still turn on myriad details unique to a given case-including not only the plaintiff-employee's (1) official job duties, but also (2) the informal customs developed around the performance of those duties and (3) further nuances involving, for example, the plaintiff-employee's understanding from his supervisors of how and what exactly the plaintiff's job entails in the particular factual scenario presented. It will be virtually impossible for any plaintiff-employee to find such a closely analogous prior Supreme Court or Tenth Circuit case, unless the prior case happened to involve this same plaintiff or, at the very least, involved another employee of the same government employer with a similar job description who chose a closely similar route to protest a similarly serious transgression of government law and ethics. That is just not a realistic possibility. To require the plaintiff to find such a directly analogous prior case would essentially grant all government employers qualified immunity on any employee's First Amendment claim at the first Garcetti/ Pickering prong before even getting to the substance of the alleged wrongdoing. It is not surprising, then, that Knopf could not cite to any prior Supreme Court or Tenth Circuit case with closely analogous facts addressing whether a government employee was acting outside the scope of his job duties. That should not be *962 fatal to Knopf's First Amendment retaliation claim.
Nor do I think such a close factually analogous case is required at this first step in the Garcetti/ Pickering analysis. The usual qualified-immunity inquiry-asking whether "at the time of the [official's] conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful," Wesby, 138 S.Ct. at 589 (internal quotation marks omitted)-focuses on the defendant government official's conduct. In contrast, the inquiry at the first step of the Garcetti/ Pickering analysis focuses instead on whether the plaintiff-employee's speech fell within that employee's job duties. That question presents a legal determination. Although the second and third Garcetti/ Pickering inquiries are also legal questions, this first prong presents a very different inquiry. See Helget, 844 F.3d at 1221-22. That first inquiry may turn, at least in part, on legal authorities such as government regulations or job descriptions setting forth the employee's job responsibilities and authority to act for his government employer.
To remain true to the purpose of the qualified-immunity analysis, of course, it must be clear to a reasonable person in the defendant government official's position that the plaintiff-employee was acting outside his job duties. But who better to make that determination, which is typically a sui generis legal question, see id. at 1222, than the court in the unique context of the case before it?
The Supreme Court has set forth governing principles to guide the determination of whether an employee's speech clearly fell outside the scope of his official or ordinary duties, but at the same time the Court has made it clear that this inquiry does not involve per se rules. Those principles indicate, for example, that it is not dispositive that the employee's speech concerned the subject matter of the plaintiff's employment or involved information that the plaintiff obtained as a result of his public employment or was expressed inside, rather than outside, his office. See Lane, 134 S.Ct. at 2379 ; Garcetti, 547 U.S. at 424, 126 S.Ct. 1951. Nor is it dispositive that the employee engaged in the speech at issue while undertaking a duty listed in his written job description; a government employer cannot "restrict employees' rights by creating excessively broad job descriptions." Garcetti, 547 U.S. at 424, 126 S.Ct. 1951. To the contrary, the fact that the government employee was speaking, as Knopf was here, through means available to other citizens can suggest that the employee is speaking as a citizen, outside his job responsibilities. Id. at 423-24, 126 S.Ct. 1951. The relevant inquiry "is a practical one." Id. at 424, 126 S.Ct. 1951.
I would apply these clearly established general principles to determine, at the first Garcetti/ Pickering inquiry, whether it was clear that the government employee's speech fell outside his job duties, instead of requiring the employee to find a close factually analogous Supreme Court or Tenth Circuit case to establish that the particular employee at issue was acting outside the scope of his job duties when engaging in the particular speech that was the basis for the discipline or discharge.
Other circuits, though not directly addressing my point, have also taken a more general approach in addressing whether it is clearly established that a government employee was speaking outside his job duties in a particular case instead of requiring the employee to identify a case directly on point factually. See Anderson v. Valdez, 845 F.3d 580, 592-602 (5th Cir. 2016) ; Ricciuti v. Gyzenis, 834 F.3d 162, 168-70 (2d Cir. 2016) ;
*963 Carollo v. Boria, 833 F.3d 1322, 1334-35 (11th Cir. 2016).[3] In Carollo, for example, the Eleventh Circuit relied upon the Supreme Court's decisions in Garcetti and Pickering to establish clearly that a government employee "violates the First Amendment [by] terminat[ing] a colleague in retaliation for speaking about matters of public concern that are outside the scope of his ordinary job responsibilities." 833 F.3d at 1334 (citing Eleventh Circuit cases also relying on Garcetti and Pickering for clearly established law). Similarly, the Fifth Circuit in Anderson held that Garcetti, and Fifth Circuit cases applying Garcetti, clearly established that at the time the events at issue in that case occurred, the First Amendment protected a government employee's speech, made outside his chain of command and outside his job duties. 845 F.3d at 600-02. In Ricciuti, the Second Circuit held Garcetti and prior Second Circuit cases clearly established that the plaintiff government employee "could not be fired simply because her speech owed its existence to her employment." 834 F.3d at 169. None of these cases went further and required the plaintiff to identify a prior factually analogous case that clearly established that an employee with the same job duties as the plaintiff, and who spoke in the same manner as the plaintiff spoke under the same circumstances, was speaking outside the scope of his or her job duties. See Anderson, 845 F.3d at 600-02 ; Ricciuti, 834 F.3d at 169-70 ; Carollo, 833 F.3d at 1334. These cases, then, in asking whether it was clearly established that the plaintiff government employee in a given case was acting outside the scope of his job duties, focused only on prior cases addressing what a court should consider in making that determination, instead of looking for a factually analogous prior case.
Here, as in these other cases, it was clearly established at the time that the Mayor declined to reappoint Knopf that a government employee's speech made outside the scope of his job duties was protected by the First Amendment. And the Supreme Court's clearly established principles for making that determination, set forth in Garcetti and Lane and applied by prior Tenth Circuit cases, provide sufficient guidance for us to determine whether it was clear to a reasonable government employee that the plaintiff employee's speech was constitutionally protected because it fell outside his job duties. That was enough to satisfy the first Garcetti/ Pickering inquiry under the qualified-immunity analysis.
Applying these clearly established principles here, then, it would have been clear to a reasonable person in the Mayor's position that Knopf sent his email outside the scope of his job duties. The Mayor would, or should, have been aware that Knopf had no official duties as to the phase of the greenway development project that was the subject of the email, and that he did *964 not have general oversight responsibilities for the department head involved in that phase of the project. The Mayor also would, or should, have been aware that Knopf sent the email to someone outside Knopf's chain of command, the City attorney. In fact, this was one of the Mayor's primary complaints about Knopf's email, that it bypassed the Mayor, who was Knopf's supervisor. Moreover, the Mayor would, or should, have been aware that any citizen with concerns over the misuse of City money in the greenway development project could have sent such an email to the City attorney expressing those concerns. Further, the Mayor knew or should have known that the underlying allegations of financial favoritism had been discussed at a public city council meeting. The facts that Knopf did not make his concerns public and that the email concerned information that Knopf may have acquired because of his government job do not preclude the conclusion that sending that email was outside the scope of Knopf's job duties.[4]
B. Garcetti/ Pickering steps two through five qualified-immunity analysis: The claimed First Amendment violation here was clearly established at the time the Mayor refused to reappoint Knopf City planner
As for the rest of the Garcetti/ Pickering factors, inquiries two through five do address the defendant government official's challenged conduct (as opposed to the first factor, which addresses the legal scope of the government employee's job duties).[5] I agree that, to be clearly established as to these factors two through five, there must be a prior Supreme Court or Tenth Circuit case or a preponderance of other cases in outside jurisdictions factually analogous to the situation the Mayor encountered here and that previously had held that conduct similar to the Mayor's conduct violated a *965 government employee's First Amendment right to free speech. Following the Supreme Court's clearly-established inquiry in Lane, then, "[t]he relevant question [here] for qualified immunity purposes is this: Could [the Mayor] reasonably have believed, at the time he" declined to reappoint Knopf as City planner, "that a government employer could" decline to reappoint an employee because of the email Knopf sent the City attorney, a communication that fell "outside the scope of his ordinary job responsibilities." 134 S.Ct. at 2381. I conclude that an objective person in the Mayor's position, "looking at the entire legal landscape," Wesby, 138 S.Ct. at 593, would have concluded that the City could not fire Knopf for the email he sent the City attorney.
Like the district court, I rely as a starting point on Dill v. City of Edmond, 155 F.3d 1193 (10th Cir. 1998).[6] In Dill, a detective assigned to a murder investigation, Dennis Dill, came to believe that the wrong person had been charged with the murder. Id. at 1200. After he declined to write a false report in the case, Dill was removed from the investigation and transferred to the patrol division. Id. Even so, several months later Dill wrote a letter to the chief of police "stating that [Dill] was aware of exculpatory evidence in the ... case which he wanted to bring to the attention of the district attorney." Id. at 1200-01. Several months after he sent that letter, Dill was assigned to work weekends and, although he was eventually transferred back to the detective division, he was never assigned another murder case. Id. at 1201.
The Tenth Circuit held, at the motion-to-dismiss stage of that case, that Dill had alleged a First Amendment violation. Id. at 1201-03. Specifically, this court held that Dill's speech was on a matter of public concern-wrongdoing on the part of the City's police officers investigating the murder. Id. at 1202. Dill continued to express his opinion even after he had been removed from the investigation and no longer had any official duties as to that investigation. Id."The fact that [Dill] chose a private forum within the police department and the district attorney's office, rather than a public forum, does not remove the speech from First Amendment protection." Id. Further, Defendants in that case, in support of their motion to dismiss, failed to assert that Dill's speech had disrupted the operation of the police department. Id. at 1203. Based on these facts, the Tenth Circuit held that Dill had alleged a First Amendment violation (and that that violation was, at the time of the challenged conduct, clearly established). Id. at 1203-05.
Analogous to the case at issue here, then, the Tenth Circuit in Dill held that retaliatory adverse employment action short of termination could support a First Amendment violation; and an employee's *966 speech, made through internal City channels and regarding alleged wrongdoing within the City, based on information the employee discovered during the course of his work, was protected by the First Amendment.
The Tenth Circuit's prior decision in Considine v. Board of County Commissioners, 910 F.2d 695 (10th Cir. 1990), is also factually similar to the facts at issue in this appeal. Similar to Knopf, the plaintiff government employee in Considine was the County's director of community and recreational resources, which included "authority over the county's waste management, building inspections, planning department, golf course, regional park, extension service office and economic development." Id. at 696. Considine claimed the County fired him for his protected speech-statements Considine made about a variety of County projects to the County Commissioners, other county officials, and the media. Id. at 697-99. Those statements involved "numerous statutory and regulatory public health and safety violations ... occurring on projects that were sponsored by the county ...[,] were under the direction of the county's elected officials and administrative staff"; and "suggested, if true, the county institution was not 'properly discharging its duties.' " Id. at 700. While Considine made some of these statements in the course of his official duties, other statements fell outside those duties. Id. Like Knopf, Considine "communicated his concerns directly to persons and organizations outside the normal chain of command of his workplace." Id. The Tenth Circuit upheld denying the defendant county officials summary judgment and qualified immunity on Considine's First Amendment claim, concluding Considine's statements were on matters of public concern and the defendants had not presented sufficient evidence to tip the balance of the weight of Considine's First Amendment free-speech interests against the weight of the government employer's interest in effective government in the government's favor. Id. at 700-02. Considine, then, clearly established that a government employer violated its high level employee's First Amendment rights when it retaliated against the employee for speech that raised the possibility of wrongdoing by government officials through both internal and public channels.
Another case analogous to ours is Conaway v. Smith, 853 F.2d 789 (10th Cir. 1988) (per curiam). In Conaway, a city's electrical inspector, Clyde Conaway, alleged that the city fired him in retaliation for his reporting his supervisors' wrongdoing. Id. at 790-91. At the summary-judgment stage of that case, the Tenth Circuit held that these allegations, supported by evidence, were sufficient to establish a First Amendment violation against a summary-judgment motion. Id. at 795-99. Conaway reiterated that a government employee's protected speech about wrongdoing on the part of city officials is a matter of public concern. Id. at 796-97. Conaway further held that the electrical inspector's interest in speaking about such wrongdoing, as a whistleblower, outweighed the City's interest in avoiding disruption to City operations. Id. at 797-99. Conaway also held that the electrical inspector in that case, like Knopf here, minimized any disruption to the government workplace by asserting his complaints internally, rather than in a public forum. Id. Conaway, then, clearly established that the fact that there might have been some disruptive effect on the city operations cannot preclude Knopf's First Amendment claim. Further, Conaway clearly established that reporting this possible abuse through internal, rather *967 than public, complaints tilts the Pickering balance toward the employee.[7]
In light of these prior Tenth Circuit cases, a reasonable person in the Mayor's position would have realized, at the time the Mayor refused to reappoint Knopf City planner, that the City could not do so based on the email Knopf sent the City attorney, which was speech protected under the First Amendment.
IV. Conclusion
For these reasons, then, I conclude, contrary to both the majority and the concurrence, that Knopf has established a First Amendment violation of his right to free speech sufficient to defeat summary judgment, has shown that it was clear to a reasonable person in the Mayor's position that Knopf's email fell outside the scope of Knopf's ordinary job responsibilities, and that the First Amendment violation was otherwise clearly established at the time the Mayor refused to reappoint Knopf City planning director. On that basis, I would affirm the district court's decision to deny the Mayor's summary judgment motion asserted he is entitled to qualified immunity.

In his response to Williams' motion for summary judgment, Knopf's discussion of qualified immunity comprised one paragraph that included four sentences. In short, Knopf did very little to demonstrate that the law applicable to his claim was clearly established.

See Garcetti, 547 U.S. at 413, 126 S.Ct. 1951 (referencing "the employee's official duties"); see also Lane, 134 S.Ct. at 2374-75 (referencing employee's "ordinary job responsibilities").

To be sure, the Supreme Court has frequently addressed qualified immunity, imploring courts not to conduct the inquiry into whether a constitutional violation was clearly established at too general a level. See, e.g., Wesby, 138 S.Ct. at 590. The Court has indicated that this is particularly necessary in the Fourth Amendment context, where "it is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts."Mullenix v. Luna, --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (internal quotation marks omitted). But the first prong of the Garcetti/Pickering inquiry, applicable to a First Amendment violation, presents a very different question, focusing not so much on the defendant government official's conduct but more on the plaintiff-employee's ordinary job responsibilities. That question is typically not well-suited to require a close factually analogous prior case clearly establishing specifically that the plaintiff-employee's speech occurred outside his job duties.

Lincoln v. Maketa 880 F.3d 533, 538-39 (10th Cir. 2018), does not contradict application of these general principles to determine whether the plaintiff-employee's speech at issue here fell outside his job duties. In Lincoln, the head of a sheriff's office's internal affairs division, Lt. Peck, alleged that her employers, the sheriff and undersheriff, retaliated against Peck after they ordered her to speak to the media and give the media a false report, but Peck instead spoke to the media and told the truth. Id. at 535. Based not on the description of her job duties, but instead on relevant case law, this court held at the motion-to-dismiss stage of that case that, for two reasons, Peck had failed to allege that it was clearly established that she was speaking outside her official duties." Id. at 536. First, although Peck alleged that speaking to the media was not part of her job duties, that was not the dispositive legal question because, as a matter of case law, speech can be "considered official even when it concerns an unusual aspect of an employee's job that is not part of his everyday functions." Id. at 539 (internal quotation marks omitted). Second, Peck was specifically ordered to speak to the media about the matter in dispute and, in doing so, to give a false report. Id. Peck argued that because she disobeyed this direction, she was not speaking as part of her official duties. Id."In some circuits," there is case law holding that an employee's "disobedience might affect whether she was speaking as part of her official duties." Id. But because the Tenth Circuit has never addressed that legal question, such a legal principle was not clearly established in this circuit. Id. Lincoln thus involved a very different legal determination than the question presented here.

Citing a Fourth Amendment case, the majority opinion, at 950-51, indicates that we always consider the plaintiff's, as well as the defendant's, conduct in performing the qualified-immunity analysis. But here, in the context of a First Amendment retaliation claim, the Tenth Circuit has designated a separate prong of our five-part analysis specifically to considering whether the plaintiff's speech fell within or without the plaintiff's job duties. Further, the majority opinion relies solely on that prong to deny Knopf's damages claim.

The majority discounts Dill because the Tenth Circuit decided it before the Supreme Court's decision in Garcetti. In fact, the cases I conclude clearly establish the First Amendment violation at issue here were all decided prior to Garcetti. But Garcetti added only the first inquiry to the Garcettiem>/Pickering analysis-whether the employee's speech fell outside his job duties. My conclusion, that an employee is not required to identify a close factually analogous prior case that clearly established that the employee's particular speech fell outside the employee's precise job duties, eliminates the majority's concern with relying here on pre-Garcetti case law. That is consistent with the Supreme Court's clearly-established analysis in Lane, which conducted that analysis by relying only on pre-Garcetti decisions from the relevant circuit. 134 S.Ct. at 2381-83. In light of the Supreme Court's qualified-immunity analysis in Lane, I also rely on pre-Garcetti cases here.

I rely on Dill because the district court relied upon it. I rely on Considine and Conaway, even though Knopf does not point us to those cases, as is his burden, to complete this legal analysis and reach the correct conclusion.