**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————

PAUL E. KNOPF,

     Plaintiff - Appellee,

v.

KENT WILLIAMS, in his individual
capacity,

     Defendant - Appellant.

No. 17-8025

———————————————

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:16-CV-00050-MLC)**
———————————————

Richard Rideout of Law Offices of Richard Rideout, PC, Cheyenne, Wyoming, for
Defendant - Appellant.

John H. Robinson of Jamieson & Robinson, LLC, Jackson, Wyoming (James E. Phillips
of Phillips Law, LLC, Evanston, Wyoming, with him on the brief), for Plaintiff -
Appellee.

———————————————

Before **BRISCOE**, **EBEL** and **MATHESON**, Circuit Judges.

———————————————

**MATHESON**, Circuit Judge.

———————————————

     Paul E. Knopf, the former Director of the Planning and Development Department

("City Planner") in Evanston, Wyoming ("City"), sued Mayor Kent Williams under 42

U.S.C. § 1983. Mr. Knopf alleged that Mayor Williams retaliated against him for

exercising his First Amendment rights.  He claimed Mayor Williams did not reappoint him to his position as City Planner because he had sent an email to the City Attorney raising concerns about impropriety relating to a City project.

In federal district court, Mayor Williams moved for summary judgment based on qualified immunity, which the court denied.  In this interlocutory appeal, he asks us to reverse the district court's denial.   This court has jurisdiction under 28 U.S.C. § 1291.

Because this opinion and Judge Briscoe's concurrence conclude that Mr. Knopf has failed to show a violation of clearly established federal law on an essential element of his claim, this court reverses the district court's denial of sovereign immunity to Mayor Williams.

## I.  BACKGROUND

### A. *Factual History*

#### 1. **Mr. Knopf's Position as City Planner**

Mr. Knopf began working for the City in 1985 in the Planning and Development Department ("Department").  He was appointed to the position of City Planner in 1987. His job as City Planner included the following responsibilities:

1. Managing the Department, which consisted of the associate city planner and an administrative assistant.

2. Addressing citizen inquiries concerning fencing and building permits and responding to development requests.

3. Preparing for planning and zoning commission meetings and hearings.

4. Preparing conditional-use permit reports, variances, zone changes, and amendments for planning commission consideration.

2

5. Collaborate in crafting site plans for various city projects.[1]

6. Representing the Department to other City departments in explaining its programs and in resolving sensitive, significant, and controversial issues.

7. Coordinating activities with other departments and outside agencies and organizations.

8. Ensuring compliance with codes and regulations related to planning and development matters.[2]

2. **Mr. Knopf's Involvement in the Bear River Project**

One of the Department's projects was the Bear River Project ("Project"), which aimed to develop a public greenway along the Bear River over a series of phases laid out in the BEAR Project Master Plan ("Master Plan"). In 1983, before Mr. Knopf's arrival, the Department identified various locations for development, including the area along the Bear River. In 1987, after joining the Department, Mr. Knopf began to develop the Master Plan, planning out the Project's sub-projects (or "phases"). The Project's main goals were to establish and maintain a public greenway for recreation, water conservation, flood control, reclamation, rehabilitation, and wildlife resources preservation.

As part of the Project, Mr. Knopf started a citizens committee that would provide input about the greenway's development. The committee eventually incorporated as the nonprofit BEAR Project, Inc. ("Non-Profit"), and played a major role in planning and

---

[1] These first five responsibilities are taken from Mr. Knopf's own description of his duties in his deposition testimony.

[2] These last three responsibilities are taken from "Examples of Important and Essential Duties" laid out in the job description for the City Planner.

3

executing the Project even though the Non-Profit was unaffiliated with the City. The Non-Profit worked on the Master Plan with Mr. Knopf, raised money, sought private and public partners, oversaw the Project's execution, and coordinated the stakeholders.

The Project involved many phases and many participants over three decades. In addition to the Department and the Non-Profit, private groups—including a private engineering firm and its contractors and sub-contractors—and other City department employees—including the Parks and Recreation Director and the City Engineer—have participated in planning and executing the Master Plan.

Although the Project involved multiple phases of development, only one is at issue here—the Meadows Project. Mr. Knopf and his Department's role in the Meadows Project differed from the other phases, such as the Bear Paw Trailhead Project and the Greenway Entryway Project, which preceded the Meadows Project. The Non-Profit coordinated the parties in these three phases, reporting to the City with any issues or concerns. The Department was involved in the planning of all three phases, developing the site plan, attending meetings with other parties, and advising them about the three phases' place in the overall Master Plan.

Mr. Knopf, as the department head, also acted as the point person between the City and the private groups (i.e. the Non-Profit and the private engineering firm), but only for the first two phases—not for the Meadows Project. The Department facilitated communication between the parties and coordinated project reviews, payments, and orders, passing them along to the City, for the first two projects. But for the Meadows Project, Brian Honey, the City Engineer, was the point person.

4

3. **Mr. Knopf's Email Concerning the Meadows Project and his Dismissal**

Disagreement arose over the Meadows Project in October 2015. T-Bar, a subcontractor for irrigation, topsoil, and sod, requested $22,300 more than the originally budgeted amount for topsoil. The private engineering firm's project engineer, Brent Sanders, recommended denying T-Bar's request because he believed T-Bar performed substandard work and had improperly calculated its costs. But Mr. Honey, the City Engineer and the City's point person on the Meadows Project, recommended fulfilling T-Bar's request. Mr. Sanders became increasingly concerned about possible collusion among Mr. Honey, Mayor Williams, and City Councilman Tom Welling, whose brother-in-law owned T-Bar.

Mr. Knopf learned of the dispute from Mr. Sanders and from a public City Council meeting. On October 7, 2015, Mr. Knopf emailed the City Attorney, Dennis Boal, with his concerns. He believed that Mr. Honey's friendship with the owner of T-Bar was "clouding [Mr. Honey's] better judgment." ROA, Vol. I at 15. Further, he stated that Mr. Honey was impeding Mr. Sanders's ability to perform his duties as the project engineer. Mr. Knopf did not receive a response from Mr. Boal.

On December 11, 2015, Mayor Williams met with Mr. Knopf. Mr. Knopf expressed his concerns about Mr. Honey and the Meadows Project and told the Mayor about his October 7 email to Mr. Boal. On January 4, 2016, Mayor Williams again met with Mr. Knopf and informed Mr. Knopf that he would not be reappointing him as City Planner. Mayor Williams said Mr. Knopf's email to the City Attorney was unacceptable and that he had lost confidence and trust in him.

5

B. *Procedural History*

Mr. Knopf filed a complaint in Wyoming state court against Mayor Williams in his individual and official capacities. It alleged a First Amendment retaliation claim under 42 U.S.C. § 1983.[3] Mayor Williams removed the case to the United States District Court for the District of Wyoming. He moved for summary judgment based on qualified immunity because (1) Mr. Knopf had failed to prove a violation of a constitutional right, and (2) the law was not clearly established at the time of Mr. Knopf's dismissal.

The district court denied Mayor Williams summary judgment on Mr. Knopf's First Amendment retaliation claim. It determined that Mr. Knopf had sufficiently alleged facts that if proven would constitute a First Amendment violation and that Mayor Williams's conduct violated clearly established law. On clearly established law, the court said that, "since at least 1998, it is clearly established that a public employer cannot retaliate against an employee for exercising their First Amendment right to free speech." Dist. Ct. Op. 17.

## II. **DISCUSSION**

### A. *Legal Background*

#### 1. **42 U.S.C. § 1983 and Qualified Immunity**

Under 42 U.S.C. § 1983, a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

---

[3] Mr. Knopf also alleged a Fourteenth Amendment deprivation of property claim. He also had brought both these claims against the City. The district court dismissed his due process claim on summary judgment.

the party injured . . . ." "Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation, ellipsis, and quotations omitted).

"Once an individual defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (quotations omitted). "This is a heavy burden. If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

"A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017). To be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). Although there need not be a "'case directly on point,'" *id.* (quoting *Mullenix*, 136 S. Ct. at 308), "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it . . . .'" *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765,

7

1774 (2015) (brackets omitted) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).

Courts must not define "clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Instead, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308. (quotations omitted). "Otherwise, 'plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *White*, 137 S. Ct. at 552 (brackets and ellipsis omitted) (quoting *Anderson*, 483 U.S. at 639).

2. **First Amendment Retaliation**

"[P]ublic employees do not surrender *all* their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (emphasis added). Rather, "the First Amendment protects a public employee's right . . . to speak as a citizen addressing matters of public concern." *Id.* The government employer, however, also has a "countervailing interest in controlling the operation of its workplaces." *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014). "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).

8

In striking this balance, the First Amendment prohibits public employers from taking adverse action against employees because of their protected speech. To determine if an employer's adverse employment action against an employee is an impermissible retaliation under the First Amendment, we apply the *Garcetti/Pickering* test. *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014); *see Garcetti*, 547 U.S. at 421; *Pickering*, 391 U.S. at 568.[4] The test consists of five elements:

(1) whether the speech was made pursuant to an employee's official duties;

(2) whether the speech was on a matter of public concern;

(3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;

(4) whether the protected speech was a motivating factor in the adverse employment action; and

(5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Trant*, 754 F.3d at 1165 (paragraph breaks added). "The first three elements are issues of law for the court to decide, while the last two are factual issues typically decided by the jury." *Id.* To prevail, a plaintiff must establish all five elements. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202-03 (10th Cir. 2007).

Although the parties dispute four of the five elements, this opinion focuses on the

_____

[4] An employee may also bring a First Amendment retaliation claim under an alternative three-part test set forth in *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). The *Worrell* test applies only when the employee brings the claims against "a defendant who is not the plaintiff's employer and when there is no contractual relationship between them." *Id.*; *see also Leverington v. City of Colorado Springs*, 643 F.3d 719, 729 (10th Cir. 2011) (distinguishing the two tests). Here, Mayor Williams was Mr. Knopf's employer. Thus, the *Garcetti/Pickering* test applies.

first element to resolve this case. "If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Couch v. Bd. of Trs. of Mem'l Hosp.*, 587 F.3d 1223, 1235 (10th Cir. 2009) (quotations omitted).

We have "taken a broad view of the meaning of speech that is pursuant to an employee's official duties." *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010) (quotations omitted). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct. at 2379. If the speech involves "the type of activities that [the employee] was paid to do," then it falls within the scope of an employee's duties. *Green v. Bd. of Cty. Comm'rs*, 472 F.3d 794, 800-01 (10th Cir. 2007).

"There are no bright line rules" in making this determination. *Chavez-Rodriguez*, 596 F.3d at 713. Many facts may be relevant—the tasks in an employee's job description, the frequency with which an employee performs a task, the subject matter of the employee's speech, the recipient of the employee's speech, the legal obligation for the employee to speak—but no one fact is determinative. *See Brammer-Hoelter*, 492 F.3d at 1203 (job description is not dispositive); *Holub v. Gdowski*, 802 F.3d 1149, 1156 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 1209, 194 L. Ed. 2d 184 (2016) (frequency of performance is not dispositive); *Lane*, 134 S. Ct. at 2379 (speech made about work is not

10

dispositive); *Rohrbough v. Univ. of Colorado Hosp. Auth.*, 596 F.3d 741, 747 (10th Cir. 2010) (speech made outside chain of command is not dispositive).

We must "take a practical view of all the facts and circumstances surrounding the speech and the employment relationship." *Brammer-Hoelter*, 492 F.3d at 1204. Ultimately, we ask whether the employee was "perform[ing] the task[] [they were] paid to perform" when they spoke. *Lane*, 134 S. Ct. at 2379. If so, the "speech was therefore commissioned by his employer," *Thomas v. City of Blanchard*, 548 F.3d 1317, 1323 (10th Cir. 2008), and it enjoys no First Amendment protection.

## B. *Standard of Review*

"We review summary judgment de novo, applying the same legal standard as the district court." *Gutierrez*, 841 F.3d at 900. A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party"—here, Mr. Knopf. *See Gutierrez*, 841 F.3d at 900.

"When the defendant has moved for summary judgment based on qualified immunity, we still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor." *Henderson v. Glanz*, 813 F.3d 938, 952 (10th Cir. 2015). "Unlike most affirmative defenses, however, the plaintiff would bear the ultimate burden of persuasion at trial to overcome qualified immunity by showing a violation of clearly established federal law." *Id.* "Thus, at

11

summary judgment, we must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Id.*

"We may, at our discretion, consider the two parts of this test in the sequence we deem best in light of the circumstances in the particular case at hand." *Bowling v. Rector*, 584 F.3d 956, 963 (10th Cir. 2009) (quotations omitted).

## C. *Analysis*

The following considers only the second requirement to overcome qualified immunity—whether the law was clearly established—and determines the district court erred in denying Mayor Williams summary judgment. Mr. Knopf did not meet his burden of showing that any violation of the First Amendment he may have suffered was based on clearly established law.

### 1. **General Statements of Law Not Sufficient**

The district court's discussion of the second qualified immunity prong consisted only of the general statement that "it is clearly established that a public employer cannot retaliate against an employee for exercising their First Amendment right to free speech." Dist. Ct. Op. at 17. Mr. Knopf relies on the district court's statement and similarly argues that at the time of his dismissal, it was clearly established that a public employer cannot retaliate against an employee for speaking on matters of public concern. *See* Aplee. Br. at 26. But these are general statements of law. As the Supreme Court has cautioned, we must not "define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. These statements merely repeat the generic *Garcetti/Pickering* standard— "the

12

First Amendment protects a public employee's right . . . to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417. Instead, for Mr. Knopf to meet his burden, "the clearly established law must be particularized to the facts of the case." *White*, 137 S. Ct. at 552 (quotations omitted).

2. **Mr. Knopf's Four Cases Not Sufficient**

Mr. Knopf's reliance on the four cases cited in his brief for clearly established law is misplaced. Two those cases—*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) and *Lytle v. City of Haysville*, 138 F.3d 857 (10th Cir. 1998)—were decided before the Supreme Court decided *Garcetti* in 2006, which added the scope-of-official-duties element to the *Garcetti/Pickering* test. *See Garcetti*, 547 U.S. at 421; *see also Leverington v. City of Colorado Springs*, 643 F.3d 719, 724 (10th Cir. 2011) (explaining that *Garcetti* "expanded on the *Pickering* test by adding a fifth, threshold inquiry that seeks to determine whether the speech at issue was made pursuant to the public employee's official duties"). *Conaway* and *Lytle* therefore provide little guidance on the official duties issue, much less clearly established law.

Mr. Knopf cannot rely on his third case, *Glover v. Mabrey*, 384 Fed. App'x 763 (10th Cir. 2010) (unpublished), because unpublished decisions "provide little support for the notion that the law is clearly established." *Mecham v. Frazier*, 500 F.3d 1200, 1206 (10th Cir. 2007); *see also Medina v. City and Cty. of Denver*, 960 F.2d 1493, 1498-99 (10th Cir. 1992) ("The appellant cites to one unpublished ruling in the United States District Court for the District of Colorado, but because that ruling was unpublished the appellant cannot rely on it to prove the clearly established law in this jurisdiction.");

13

*Green v. Post*, 574 F.3d 1294, 1306 n. 10 (10th Cir. 2009) (citing *Medina*, 960 F.2d at 1498-99 approvingly).[5]

His fourth case, *Helget v. City of Hays*, 844 F.3d 1216 (10th Cir. 2017), does not help either because it was decided more than a year after the events occurred in this case. *See Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) ("A right is clearly established if, at the time of the conduct, existing precedent has placed the statutory or constitutional question beyond debate." (quotations omitted)).[6]

## 3. *Dill* **Not Sufficient**

Mr. Knopf does not discuss the only case the district court cited to support its clearly established law ruling—*Dill v. City of Edmond*, 155 F.3d 1193 (10th Cir. 1998).

---

[5] In *Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012), we explained that *Medina* concerned an unpublished district court opinion and did not address whether a district court must ignore unpublished opinions from this court in determining clearly established law. *Id.* at 1197 n.5.

[6] Further examination of these cases reinforces their shortcomings regarding clearly established law. Three of the cases do not address official duties, the first element of *Garcetti/Pickering*. *See Conaway*, 853 F.2d at 795-96 (confining review to the second, third, and fourth elements); *Helget*, 844 F.3d at 1222 (confining review to third element); *Lytle*, 138 F.3d at 865 (confining review to third element).

*Glover* briefly discusses the first *Garcetti*/*Pickering* step in a footnote. *See* 384 Fed. App'x at 769 n.4. In that case, Paul Glover, a construction company owner, bid to perform construction projects for the Oklahoma Department of Transportation ("ODOT") and secured a contract. *Id.* at 765-66. After work on the project began, Mr. Glover criticized ODOT's design to the media, stating that it increased costs. *Id.* at 779. ODOT then threatened to take away his status as a prequalified bidder. *Id.* at 766. *Glover*'s facts vary from this case. First, Mr. Glover contacted the media, whereas Mr. Knopf emailed only the City Attorney. *Id.* at 779. Mr. Knopf's speech was internal; he had not brought the alleged wrongdoing to "the attention of law enforcement or other outside parties." *Thomas*, 548 F.3d at 1324. Second, Mr. Knopf exercised general oversight responsibilities over the Project and its Master Plan, whereas Mr. Glover's job included no such oversight responsibilities. *See Glover*, 384 Fed. App'x at 765-66.

In that case, police detective Dennis Dill told his supervisors he doubted the guilt of a murder investigation suspect and wrote in a letter to his police chief that he was aware of exculpatory evidence. *Id.* at 1200-01. His supervisors thought otherwise about the suspect's guilt. They transferred Mr. Dill to a different division and changed his shifts. *Id.*

The district court dismissed Mr. Dill's claim for First Amendment retaliation, ruling he had failed to state a claim. This court reversed, holding his statements addressed a matter of public concern and that the City had failed to show its interests outweighed his speech interests, the second and third elements of the *Garcetti/Pickering* test. *Id.* at 1202-03.

*Dill* does not supply Mr. Knopf with clearly established law to overcome Mayor Williams's qualified immunity defense.

First, *Dill* preceded the 2006 decision in *Garcetti*, which added the restrictive element of "whether the speech was pursuant to official duties" to the test for a First Amendment retaliation claim. *See Leverington*, 643 F.3d at 724. The *Dill* opinion listed the elements required then for a retaliation claim. 155 F.3d at 1201. The "official duties" element of *Garcetti/Pickering* was not one of them. *Dill* therefore cannot provide clearly established law on whether Mr. Knopf's speech fell within the scope of his official duties because there was no such element when *Dill* was decided.

Second, the Supreme Court's *Garcetti* decision shows why *Dill* does not provide Mr. Knopf clearly established law. The Court considered whether adverse employment action against a deputy district attorney for statements to his supervisors that criticized

15

the adequacy of a search warrant affidavit was a First Amendment retaliation violation. It held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421.

Four justices dissented. Justice Stevens, asserting it "is quite wrong" that "there is a categorical difference between speaking as a citizen and speaking in the course of one's employment," called the majority's rule "new," "novel," and "perverse." *Id.* at 427. Justice Souter said the majority chose "an odd place to draw a distinction." *Id.* at 430. Justice Breyer described the majority's test as "too absolute." *Id.* at 446.

For our purposes, the contrasting views in *Garcetti* confirm there was no clearly established law dividing official speech from citizen speech when *Dill* was decided.

Third, although *Dill* may be interpreted as implicitly recognizing that Mr. Dill's speech was not part of his official duties, the court was not squarely presented with that issue. As mentioned above, there was no "official duties" element at that time. Moreover, we recognized that "Defendants' motion to dismiss focused solely on whether Plaintiff's speech involved a matter of public concern." *Id.* at 1203. And *Dill* did not analyze whether the detective's statements fell within his responsibilities. A reasonable official in Mayor Williams's position could hardly understand *Dill* as providing clear guidance on whether Mr. Knopf's speech exceeded his official duties when this court in *Dill* said the only issue before it was whether Mr. Dill's speech was a matter of public concern.

16

Fourth, although *Dill* may bear some factual similarity to this case—e.g., Mr. Dill had worked on the criminal investigation for five weeks before it was referred to a multi-district task force, *id.* at 1200—it also varies factually. For one thing, Mr. Knopf had worked on the Project for almost 30 years, including development of the master plan and coordination with multiple stakeholders in his role as City Planner. And unlike Mr. Dill, who served as a rank-and-file detective without supervisory responsibilities, Mr. Knopf's job as City Planner tasked him with a broad oversight role for matters like the Bear River Project.

Fifth, perhaps Mr. Knopf could argue, though he has not here, that under *Garcetti/Pickering*, the *Dill* court would have decided that Mr. Dill spoke to his supervisors and police chief as a private citizen and not as part of his official duties, and therefore his speech was protected. But even if that argument may have merit, so would the argument that, as a detective having worked on the case, Mr. Dill raised his concerns as part of his official duties. It is not certain how the *Dill* decision would have come out under the "official duties" element of *Garcetti/Pickering*, or that "the law [here, *Dill*,] was sufficiently clear that" a reasonable person in Mayor Williams's position "would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

4. **Failure to Carry Burden**

Though Mr. Knopf need not cite "'a case directly on point,'" *Henderson*, 813 F.3d at 953 (quoting *Stanton v. Sims*, 134 S.Ct. 3, 5 (2013)), he must show the law "would have been clear to a reasonable officer [in Mayor Williams's position] that his conduct

17

was unlawful in the situation." *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011) (quotations omitted). The key question is whether Mayor Williams "reasonably [could] have believed, at the time he fired [Mr. Knopf], that a government employer could fire an employee on account of" speech stemming from almost 30 years of high-level involvement with an ongoing project. *See Lane*, 134 S. Ct. at 2381. Mr. Knopf has not shown that such a belief was unreasonable based on then-existing law. Because it would not have been "beyond debate" to a reasonable official that Mr. Knopf's email exceeded the scope of his official duties, *Mullenix*, 136 S. Ct. at 308 (quotations omitted), Mayor Williams is entitled to qualified immunity on the particular facts of this case.

Because Mr. Knopf has not "carried [his] burden to show violation of a clearly established constitutional right, the district court erred in denying [Mayor Williams] qualified immunity." *See Henderson*, 813 F.3d at 953.

5. **The Dissent's Theory of Qualified Immunity**

The dissent's approach to qualified immunity analysis under the first element of *Garcetti/Pickering* runs counter to precedent. Instead of "identify[ing] a case where an [official was] acting under similar circumstances," *White* 137 S.Ct. at 552, the dissent "would apply clearly established general principles derived from Supreme Court precedent—from *Lane v. Franks*, 134 S.Ct. 2369 (2014) and *Garcetti*, 547 U.S. 401 (2006)—to determine whether the government employee's speech fell outside the scope

18

of his job duties." Dissent at 2.[7] The dissent fails to cite a Supreme Court or Tenth

Circuit case supporting its approach.[8]

The Supreme Court has warned against "defin[ing] clearly established law at a

high level of generality." *al-Kidd*, 563 U.S. at 742. Clearly established law "must be

particularized to the facts of the case," *White*, 137 S. Ct. at 552 (quotations omitted),[9] but

---

[7] The dissent attempts to distinguish the first *Garcetti/Pickering* element from the other four: Because "the inquiry at the first step . . . . present[s] a legal determination [and] . . . . may turn, in part, on legal authorities such as government regulations or job descriptions setting forth the employee's job responsibilities," the first step is "a very different inquiry." Dissent at 10 (citing *Helget*, 844 F.3d at 1221-22). But because the second and third steps are also legal questions, *see Trant*, 754 F.3d at 1165, and job-specific inquiries, the dissent does not adequately explain why only the first step should be excluded from traditional qualified immunity analysis. The third step, like the first, may turn on government regulations or job descriptions setting forth an employee's job responsibilities. *See, e.g.*, *Helget*, 844 F.3d at 1223 (examining plaintiff's job description and role at a law enforcement department when balancing her speech interests against her employer's efficiency interest).

[8] The three out-of-circuit opinions the dissent cites—*Anderson v. Valdez*, 845 F.3d 580 (5th Cir. 2016), *Ricciuti v. Gyzenis*, 834 F.3d 162 (2d Cir. 2016), and *Carollo v. Boria*, 833 F.3d 1322 (11th Cir. 2016)—do not support this approach. First, none singles out the first *Garcetti/Pickering* element as "not requir[ing] a prior case that clearly establishes" law. Dissent at 3; *see, e.g.*, *Carollo*, 833 F.3d at 1334 (also discussing matters of public concern). Second, all three examine Supreme Court and circuit precedent in search of clearly established law beyond the general principles derived from *Garcetti* and *Lane*. *See Anderson*, 845 F.3d at 601 (considering *Howell v. Town of Ball*, 827 F.3d 515 (5th Cir. 2016)); *Ricciuti*, 834 F.3d at 170 (considering "pre–*Garcetti* case law"); *Carollo*, 833 F.3d at 1334 (discussing *Pickering*, 391 U.S. 563, and *Akins v. Fulton Cty., Ga.*, 420 F.3d 1293 (11th Cir. 2005)).

[9] The dissent overstates this opinion's treatment of clearly established law. Although the facts must be "particularized," they need not be "directly on point." *al-Kidd*, 563 U.S. at 741. The Supreme Court's decisions in *Mullenix* and *White* do not require Mr. Knopf to present a virtually identical "case clearly establishing that a city department head . . . would be acting outside the scope of his job duties, analogous to Knopf's employment responsibilities, if he sent an email to . . . a co-equal city department head, complaining about the misuse of city money in a development project

19

the dissent nonetheless relies on "general principles," Dissent at 2.[10] Moreover, we

examine "the entire legal landscape at the time of the [the alleged violation]" to ascertain

clearly established law. *Wesby*, 138 S. Ct. at 593. The dissent's lens, which is limited to

*Lane* and *Garcetti*, should widen to consider relevant "Supreme Court or Tenth Circuit

decision[s], or the weight of authority from other courts" in determining whether clearly

established law applies to this case. *Patton*, 868 F.3d at 1220.[11]

The dissent also suggests, again without precedent, that the first step of

*Garcetti/Pickering* warrants different treatment than other qualified immunity cases

because of its focus on the plaintiff-employee's speech as opposed to the defendant-

official's conduct. *See* Dissent at 10. But we rarely focus on one party's conduct in

---

that the person in Knopf's position was not overseeing." Dissent at 8-9. But, as
discussed above, the four cases Mr. Knopf has presented and the one the district court
cited do not provide clearly established law based on a case with sufficiently
particularized facts.

[10] Our "sliding scale" approach to qualified immunity in Fourth Amendment
excessive force cases comes closest to supporting the dissent's approach, but not nearly
close enough. Under that approach, we have stated that "[t]he more obviously egregious
the conduct in light of prevailing [Fourth Amendment] constitutional principles, the less
specificity is required from prior case law to clearly establish the violation." *Casey v.
City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). *But see Lowe v. Raemisch*,
864 F.3d 1205, 1211 (10th Cir. 2017) (stating that "our sliding-scale approach may
arguably conflict with recent Supreme Court precedent on qualified immunity"). Here, it
is far from obvious that Mr. Knopf's communication at issue occurred outside his official
duties. *See* Concurrence at 7 ("[I]t is a close question" whether "Mr. Knopf's email did
not fall within the scope of his official duties as a City employee").

[11] Although we examine the legal landscape, the plaintiff must paint it. *See
Henderson*, 813 F.3d at 952 (the burden for demonstrating clearly established law falls on
the plaintiff). This opinion has therefore considered the four cases Mr. Knopf has raised
and the one the district court cited.

qualified immunity analysis. *See, e.g., A.M. v. Holmes*, 830 F.3d 1123, 1141 (10th Cir. 2016), *cert. denied sub nom. A.M. ex rel. F.M. v. Acosta*, 137 S. Ct. 2151 (2017) (examining the plaintiff-suspect's conduct in determining whether a reasonable defendant-official had probable cause for arrest).  The question here, as in other contexts, considers the conduct of both parties:  would a reasonable person in Mayor Williams's position have understood Mr. Knopf to have spoken outside his official duties?  *See Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1333 (10th Cir. 2007).

## III. CONCLUSION

Based on the foregoing opinion and Judge Briscoe's concurrence, this court reverses the district court's denial of qualified immunity on Mr. Knopf's First Amendment retaliation claim.

No. 17-8025, *Knopf v. Williams*
**BRISCOE**, Circuit Judge, concurring.

I agree with Judge Matheson that "Knopf did not meet his burden of showing that any violation of the First Amendment he may have suffered was based on clearly established law." Maj. Op. at 12. But I also conclude, as a preliminary matter, that Knopf failed to establish that defendant Williams violated his First Amendment rights by declining to reappoint him. And, because the analysis of these two questions is so intertwined in this case, I find it useful to address both of them.

I

*Standard of review*

"[W]e review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." Bowling v. Rector, 584 F.3d 956, 964 (10th Cir. 2009) (quotation marks omitted). "Upon the defendant's assertion of the qualified immunity defense, the burden shifts to the plaintiff, who must meet a strict two-part test by showing (1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct." Id. (quotation marks omitted).

*Did Williams violate Knopf's First Amendment rights?*

Knopf claims that Williams decided not to reappoint Knopf as City Planner in retaliation for Knopf having exercised his First Amendment rights—more specifically, for having emailed City Attorney Dennis Boal—regarding the Bear Meadows project. The threshold question, in deciding whether Knopf can survive summary judgment on this

claim, is whether he can establish that Williams actually violated his First Amendment rights.

"A public employer may not 'discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.'" Helget v. City of Hays, KS, 844 F.3d 1216, 1221 (10th Cir. 2017) (quoting Rankin v. McPherson, 483 U.S. 378, 383 (1987)). "'Speech by citizens on matters of public concern lies at the heart of the First Amendment,' and 'public employees do not renounce their citizenship when they accept employment.'" Id. (quoting Lane v. Franks, 134 S. Ct. 2369, 2377 (2014)). "Therefore, the Supreme Court 'has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights.'" Id. (quoting Lane, 134 S. Ct. at 2377).

"Nevertheless, a public employer must be able to control the operations of its workplace." Id. (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). "'Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services.'" Id. (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). As a result, "the First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Lane, 134 S. Ct. at 2374 (quoting Pickering, 391 U.S. at 568).

2

The so-called Garcetti/Pickering test, which is derived from these principles, governs our review of Knopf's First Amendment retaliation claim. See Helget, 844 F.3d at 1221. We outlined the contours of this test in our decision in Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192 (10th Cir. 2007):

> After the Supreme Court's recent decision in Garcetti, it is apparent that the "Pickering" analysis of freedom of speech retaliation claims is a five step inquiry which we now refer to as the "Garcetti/ Pickering" analysis. First, the court must determine whether the employee speaks "pursuant to [his] official duties." Garcetti, 126 S. Ct. at 1960; see also Mills, 452 F.3d at 647 ("Garcetti . . . holds that before asking whether the subject matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen'. . . ."). If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created." Garcetti, 126 S. Ct. at 1960. Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. See Green v. Bd. of County Commr's, 472 F.3d 794, 798 (10th Cir. 2007); Mills, 452 F.3d at 647–48. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a "substantial factor or a motivating factor in [a] detrimental employment decision." Lybrook, 232 F.3d at 1338 (internal quotation marks omitted). Finally, if the employee establishes that his speech was such a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." Id. at 1339 (internal quotation marks omitted).

492 F.3d at 1202–03. "The first three steps" of this test "concern questions of law for the courts, and the last two concern questions of fact" that are typically left for a jury. Helget, 844 F.3d at 1222.

3

The district court in this case concluded with respect to the first three of these steps that (1) "the email communication was not pursuant to [Knopf's] official duties," Aplt. App., Vol. V at 116, (2) "the subject matter of the email regarded a matter of public concern," id., and (3) "the interest of the City d[id] not outweigh the interest of [Knopf] regarding the particular speech at issue in this matter," id. at 121. As to the fourth and fifth steps, the district court concluded that "[t]he information presented . . . in support and opposition to the motion for summary judgment establishe[d] a factual question on both of these issues and" thus it "w[ould] allow the jury to determine these questions." Id.

Williams argues in his appeal that the district court applied the first and third steps "too narrowly and did not properly evaluate the undisputed facts when considering the defense of qualified immunity." Aplt. Br. at 10. Because the first and third steps involve conclusions of law, Williams' challenge to the district court's conclusion on each of these steps is properly before us in this interlocutory appeal and we review those determinations de novo. See Helget, 844 F.3d at 1221. As discussed below, I conclude that the district court did not err with regard to its analysis of step one (although it is a close question), but did err with regard to its analysis of step three.

*a) Step One*

Step One of the Garcetti/Pickering test requires us to decide whether Knopf's email communication to Boal was pursuant to Knopf's official duties. It is well-established that "when public employees make statements pursuant to their official duties,

4

the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Seifert v. Unified Gov't of Wyandotte Cty., 779 F.3d at 1151 (internal quotation marks omitted).

Unfortunately, "[t]here are no bright line rules to make this determination." Chavez-Rodriguez v. City of Santa Fe, 596 F.3d 708, 713 (10th Cir. 2010). That said, however, we take "a practical view of all the facts and circumstances surrounding the speech and the employment relationship" and "a broad view of the meaning of speech that is pursuant to an employee's official duties." Chavez-Rodriguez v. City of Santa Fe, 596 F.3d 708, 713 (10th Cir. 2010) (internal quotation marks omitted). We "ha[ve] further emphasized that no one factor is dispositive," and that, instead, the "guiding principle is that speech is made pursuant to official duties if it involves 'the type of activities that the employee was paid to do.'" Id. (brackets omitted) (quoting Green v. Bd. of Cty. Comm'rs, 472 F.3d 794, 801 (10th Cir. 2007)). "Stated another way, 'if an employee engages in speech during the course of performing an official duty and the speech reasonably contributes or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties.'" Id. (quoting Brammer-Hoelter, 492 F.3d at 1204).

As an initial matter, it appears to be undisputed that Knopf drafted the email on and sent it from his work computer. Further, the email was sent exclusively to Boal, who was also a City employee (albeit a contract employee as opposed to a full-time employee). Attached to the email was a prior email thread discussion between a group of

5

City employees, including Knopf. Thus, the entire context of the speech was "more akin to a work discussion between two public officials" than a communication between a private citizen and a public official or between two private citizens. Chavez-Rodriguez, 596 F.3d at 714. But that context, standing alone, does not appear to be sufficient under Tenth Circuit law to establish that the email was made pursuant to Knopf's official duties. Id. Moreover, the fact that the email "concerns information acquired [by Knopf] by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." Lane, 134 S. Ct. at 2379.

The purpose of the email appears to have been two-fold: to inform Boal, in his official capacity as City Attorney responsible for overseeing the City's contracts, of the issues regarding T-Bar's change request (i.e., Honey's position regarding it and his potential conflict of interest) and to persuade Boal, again in his official capacity, to take some type of action, such as speaking with Williams and/or Honey, to ensure that T-Bar's change request was rejected.

It is undisputed that Boal was not Knopf's supervisor and was instead simply another department head, similar to Knopf, albeit one who had responsibility for overseeing City contracts. Although "an employee's decision to go outside of their ordinary chain of command does not necessarily insulate their speech," Rohrbough v. Univ. of Colo. Hosp. Auth., 596 F.3d 741, 747 (10th Cir. 2010), it is a factor that, in my view, weighs in favor of a conclusion that the email was not made pursuant to Knopf's official duties. That is because, to the extent that Knopf had any involvement in the Bear

6

Meadows project at all (and the record suggests his role was, at most, limited to being a "planning resource" for the project), it is undisputed that his official duties in that regard did not extend to overseeing the work performed on the project by contractors or subcontractors, or, more specifically, to reviewing or approving change requests, such as the one that was submitted by T-Bar. Thus, this was not a matter of Knopf "going outside of his chain of command" regarding an issue that fell within his official duties, but rather of Knopf reaching out to another City employee whose official duties encompassed the issue that Knopf was concerned about.

Another relevant inquiry in analyzing the first step is whether, in considering Knopf's email to Boal, there is a "relevant analogue to speech by citizens who are not government employees." Garcetti, 546 U.S. at 424. Presumably, any citizen armed with the information that Knopf had could have contacted Boal, who as a public official was presumably accessible to citizens either by phone or email, to express concern about T-Bar's change request and to ask Boal to investigate and potentially take action regarding it. Thus, this weighs in favor of treating the email as outside of Knopf's official duties.

In the end, although it is a close question, I agree with the district court that Knopf's email did not fall within the scope of his official duties as a City employee. Thus, I conclude that the district court did not err in analyzing the first step of the Garcetti/Pickering framework.

*b) Step Three*

Williams also takes issue with the district court's conclusion regarding the third

step of the Garcetti/Pickering test, i.e., that "the interest of the City d[id] not outweigh the interest of [Knopf] regarding the particular speech at issue in this matter."  Aplt. App., Vol. V at 121.

The Supreme Court "ha[s] recognized that government employers often have legitimate interests in the effective and efficient fulfillment of their responsibilities to the public, including promoting efficiency and integrity in the discharge of official duties, and maintaining proper discipline in public service."  Lane, 134 S. Ct. at 2381 (internal quotation marks and brackets omitted).  Thus, the Court has "recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  Rankin v. McPherson, 483 U.S. 378, 388 (1987).  At the same time, the Court has "cautioned . . . that a stronger showing of government interests may be necessary if the employee's speech more substantially involves matters of public concern."  Lane, 134 S. Ct. at 2381 (internal quotation marks and brackets omitted).  And the governmental defendant bears the burden of proof to justify its regulation of speech.  Connick v. Myers, 461 U.S. 138, 150 (1983).

Williams argues that, as part-time Mayor of the City, he must have faith and confidence in his department heads, including Knopf, and that the department heads, including Knopf and Boal, must work together.  Williams in turn argues that Knopf's

8

email was contrary to these goals and had a significant likelihood of being disruptive. Indeed, Williams argues that "[w]hat [Knopf] did here was an intentional 'end run' around his supervisor [Williams] to undermine [Williams'] position and to undermine Honey." Aplt. Br. at 24. Further, Williams argues, Knopf "was concealing information from the Mayor, communicating with other City employees without including the Mayor, and was insubordinate." Id. Lastly, Williams argues that he "found this email to be indicative of greater concerns that he had over the course of the year with [Knopf]." Id. at 26. According to Williams, he "had a significant interest in being able to trust his department heads and for them to be able to work together in an efficient manner and he no longer had trust in [Knopf]." Id.

I conclude that these are legitimate concerns on the part of Williams specifically and the City in general. Although the record indicates that it was not part of Knopf's official duties to deal with T-Bar's change request, it is undisputed that T-Bar's change request fell clearly within the scope of the Mayor's official duties. More specifically, it was part of the Mayor's official duties to consider and vote on the change request and, according to the record, the Mayor ultimately voted to approve T-Bar's change request. Presumably, Knopf, a longtime City employee, was aware that Williams would ultimately be voting on T-Bar's change request and both could and should have approached Williams, who was his direct supervisor, with any concerns he had about T-Bar's change request. By failing to do so, and instead contacting another City department head (Boal) and calling into question the judgment and ethics of yet another department head

9

(Honey), Knopf's actions created a potential for disruption (between at least himself and Boal, as well as possibly Honey and others) and also undermined Williams' trust and confidence in Knopf. And that in turn would have had a detrimental impact on the working relationship between Williams and Knopf.

To be sure, Boal conceded in his deposition that Knopf had correctly interpreted the contract provisions regarding the Meadows Project and that, consequently, it would have been justified for the City to reject T-Bar's change request. That said, however, there is no evidence that it was illegal for the Mayor and City Council to approve the change request. Moreover, the fact that there was a legitimate contractual basis for rejecting T-Bar's change request does not override the legitimate interests expressed by Williams and the City.

For these reasons, I conclude, contrary to the determination made by the district court, that the interests expressed by Williams and the City were significant enough to outweigh Knopf's interest in speaking to Boal. Consequently, I conclude that Knopf failed to establish that Williams violated his First Amendment rights by failing to reappoint him as City Planner.

*Did Williams violate clearly established law?*

In denying summary judgment in favor of Williams, the district court also concluded that Knopf established that the law applicable to his First Amendment retaliation claim was clearly established at the time that Williams decided not to reappoint him as City Planner. Judge Matheson concludes, and I agree, that the district court erred

10

in reaching this conclusion.

According to the Supreme Court, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotations omitted). The Supreme Court has "repeatedly told [lower] courts . . . not to define clearly established law at a high level of generality." Id. (internal quotations omitted). In other words, broad principles typically cannot constitute clearly established law. White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam). Although it is not necessary that there be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." Id. (internal quotations omitted).

As discussed above, it is a very close question whether, under step one of the Garcetti/Pickering framework, Knopf's email was made pursuant to his official duties or was, instead, a matter of private speech. The difficulties posed by that analysis highlight why it may not have been clearly established in late 2015 that Knopf's email constituted protected First Amendment speech, rather than simply work-related speech. Moreover, Knopf has not pointed to any case that is remotely factually similar from 2015 or before, i.e., a case in which a court held that a similar email constituted protected First Amendment speech by a public employee.[1] Thus, I conclude that it was entirely

---

[1] In his response to Williams' motion for summary judgment, Knopf's discussion of qualified immunity comprised one paragraph that included four sentences. In short, Knopf did very little to demonstrate that the law applicable to his claim was clearly

11

reasonable for Williams to "believe that, as a legal matter, [Knopf] w[as] speaking in [his] capacity as [an] employee[] of the [City]" rather than as a private citizen. Crouse v. Town of Moncks Corner, 848 F.3d 576, 585 (4th Cir. 2017).

Likewise, Knopf has not pointed to a single case that is remotely factually similar in terms of discussing whether a public employee can be terminated (or not reappointed) in response to having sent an email to another public employee regarding a matter of public concern. Thus, again, he has failed to demonstrate that it was clearly established, in late 2015 or early 2016, that it was unconstitutional for a supervisor to terminate a subordinate for having sent an email like the one that Knopf sent.

In short, Knopf has failed to identify clearly established law that is "particularized" to the facts of his case. White, 137 S. Ct. at 552. That is because, as of late 2015 and early 2016, the outcome of the Pickering balancing test, as applied to the facts presented in this case, did not place "beyond debate" the questions of whether Knopf spoke as a private citizen when he sent his email and, in turn, whether it was proper for Williams to discipline Knopf for sending the email. Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). Consequently, Williams was entitled to qualified immunity from Knopf's First Amendment retaliation claim.

---

established.

12

Knopf v. Williams, No. 17-8025
**EBEL**, J., dissenting.


Plaintiff Paul Knopf claims his government boss, Evanston's Mayor Kent

Williams, declined to reappoint Knopf as City planner in retaliation for Knopf engaging

in speech protected by the First Amendment.  I would affirm the district court's decision

to deny the Mayor qualified immunity from Knopf's damages claim at the summary-

judgment stage of this litigation.  My conclusion is contrary to both of the other opinions

in this case.

I would, in particular, not require for purposes of the qualified-immunity analysis

that Knopf identify factually on-point precedent that clearly established that the speech in

which Knopf engaged—sending an email to the City attorney expressing concern about

the possible misuse of City money in a greenway development project—fell outside the

scope of Knopf's job duties as City planner, which is the first prong of the

Garcetti/Pickering[1] test.  This initial predicate inquiry in the five-part Garcetti/Pickering

analysis that applies to Knopf's First Amendment claim turns, not on the defendant's

alleged misconduct, but instead on the legal question of the precise and nuanced job

duties required of Evanston's planner.

There was only one Evanston planner with Knopf's job duties and responsibilities,

so to require him to come up with preexisting precedent clearly establishing his job duties

is not only impractical—it is in fact not possible.  Requiring Knopf to come up with such

_____

[1] Garcetti v. Ceballos, 547 U.S. 410 (2006); Pickering v. Bd. of Educ., 391 U.S. 563
(1968).

precedent before he can defeat a qualified-immunity defense is to tell Knopf, and countless other government employees with unique jobs, that they have been disenfranchised from being able to assert their constitutional rights—here, First Amendment rights—against their employer. A government employee like Knopf will rarely, if ever, be able to identify a prior Supreme Court or Tenth Circuit case holding that a person with his particular job title and his same accompanying duties, engaging in the same speech under similar circumstances, was acting beyond the scope of his unique job duties.

Instead, I would apply clearly established general principles derived from Supreme Court precedent—from Lane v. Franks, 134 S. Ct. 2369 (2014), and Garcetti, 547 U.S 410 (2006)—to determine whether the government employee's speech fell outside the scope of his job duties. Of course, on the other four Garcetti/Pickering inquiries, I do agree that there has to be prior factually relevant precedent to defeat qualified immunity. But I believe that requirement is satisfied here.

## I. Relevant analysis summarized

In Lane, the Supreme Court stated:

[T]he First Amendment protection of a public employee's speech depends on a careful balance "between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public service it performs through its employees."

134 S. Ct. at 2374 (quoting Pickering, 391 U.S. at 568) (alteration omitted). To address this balancing, we apply the five-part Garcetti/Pickering analysis, asking

2

(1) whether the speech was made pursuant to the employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

Helget v. City of Hays, 844 F.3d 1216, 1221 (10th Cir. 2017) (quotation omitted).

To determine whether Knopf has established a constitutional violation, I apply these five Garcetti/Pickering factors substantively to conclude that Knopf has alleged and sufficiently supported a claim that the Mayor violated the First Amendment by not reappointing Knopf as City planner because of Knopf's email to the City attorney. In reaching that conclusion, I disagree with Judge Briscoe's concurrence at the third step in the Garcetti/Pickering analysis. Contrary to her concurrence, I would conclude that weighing Knopf's free-speech interest against his government employer's interest in an efficient workplace, the balance tips in Knopf's favor because he was speaking as a whistleblower about possible wrongdoing by City officials and Knopf raised his concerns internally, which was less disruptive than if Knopf made his concerns public.

I then address the qualified-immunity question—whether the First Amendment violation at issue here was clearly established at the time the Mayor refused to reappoint Knopf City planner. Contrary to both my colleagues in the majority opinion, I conclude that, although there must be a prior case that clearly establishes the First Amendment violation under Garcetti/Pickering's factors two through five, I would not require a prior case that clearly establishes, at the first Garcetti/Pickering inquiry, that an employee in Knopf position would have been speaking outside the scope of his job duties when he

3

sent an email to the City attorney, another City department head, complaining about the possible misuse of city money in a development project that the person in Knopf's position was not overseeing.

The analysis that follows, then, requires some redundancy in discussing the five Garcetti/Pickering inquiries because those factors are relevant both to determine, substantively whether Knopf has established a First Amendment violation and to determine whether the First Amendment violation was clearly established at the time of the Mayor's challenged conduct.

## II. Knopf established a triable First Amendment claim on the underlying claim

The first question is whether Knopf sufficiently established a claim that the Mayor violated the First Amendment. To answer that substantive question, I apply the five Garcetti/Pickering inquiries.

### A. Garcetti/Pickering steps one, two and three

The first three steps of the Garcetti/Pickering test involve legal conclusions for the court to make. See Helget, 844 F.3d at 1222.

Step one inquires whether the government employee was speaking within the scope of his official duties. See id. at 1221. The First Amendment does not protect speech that is part of the employee's job. See Garcetti, 547 U.S. at 421. Here, however, the record establishes that Knopf sent his email to the City attorney as a citizen, acting outside the scope of Knopf's official or ordinary job duties as a city employee.[2] Judge

---

[2] See Garcetti, 547 U.S. at 413 (referencing "the employee's official duties"); see also Lane, 134 S. Ct. at 2374-75 (referencing employee's "ordinary job responsibilities").

4

Briscoe, in her concurrence, reaches the same conclusion. As her concurrence notes, Knopf did not have any specific responsibilities for the construction of the development project at issue here, he did not have general oversight responsibilities for other City department heads, and Knopf sent his email about his concerns that City money was being misused to the City attorney, who was outside Knopf's chain-of-command, just as any citizen might have done.

Step two inquires whether the government employee was speaking on a matter of public concern. See Helget, 844 F.3d at 1221. Here, no one disputes that Knopf's email addressed a matter of public concern.

Step three requires the court to balance the government employee's constitutionally protected interest in speaking as a citizen on a matter of public concern against the government employer's interest in promoting the efficiency of the public service that the government provides. See id. I part ways with Judge Briscoe's concurrence at this third step and agree instead with the district court that, as a legal matter, Knopf's interest in speaking as a citizen regarding the possible misuse of City money on the greenway development project outweighs the City's interest in efficient public service, at least insofar as such interest might be impaired by Knopf's email.

On the employee's side of the scale, Knopf's free-speech interest is entitled to "greater weight" here because his email concerned the possibility of government corruption or wrongdoing. Id. at 1223. "Disruptions in . . . working relationship[s]" and "general disharmony in the office[] are foreseeable consequences when an employee

5

reports improper activities of coworkers or supervisors." Conaway v. Smith, 853 F.2d

789, 797-98 (10th Cir. 1988) (per curiam).  Because of

> the vital interest the public has in the integrity of those who administrate their government[,] . . . [i]t would be anomalous to hold that because the employee's whistle blowing might jeopardize the harmony of the office or tarnish the integrity of the department, the law will not allow him to speak out on his perception of potential improprieties or department corruption.

Id. at 798 (internal citations omitted).  For this reason, I am not persuaded, as the

concurrence is, that the Mayor's need to trust his department heads and the need for the

City's department heads to get along outweigh Knopf's interest in speaking as a citizen

on the possible misuse of City money, a concern that implicated the City engineer, who

was the subject of Knopf's email, and implicated the Mayor as well.

The weight on the employer's side of the scale is diminished, not only because

Knopf was speaking about the possibility of wrongdoing by City officials, but also

because Knopf only directed his concerns internally to the City attorney, rather than

making his concerns public, which could have been far more disruptive to the City

workplace.  See Helget, 844 F.3d at 1223; Conaway, 853 F.2d at 798; cf. Rock v.

Levinski, 791 F.3d 1215, 1216 (10th Cir. 2015) (concluding school principal's free

speech interest in speaking publicly against school district's decision to close principal's

school was outweighed by school district's "concern that those holding high-ranking

policy positions speak publicly with a single voice on policy matters").  Moreover, the

matters Knopf addressed in his email were not confidential; they had been discussed at an

earlier public meeting.

Although the Mayor asserts that Knopf should have sent the email to the Mayor, who was Knopf's supervisor, a citizen speaking on such a matter of public concern would not have been relegated to communicating only with the Mayor. Instead, the City attorney would have been available and an appropriate official to receive and act upon such a citizen complaint about the possible misuse of City funds. The City attorney, after all, had responsibility for City contracts, under which the alleged misuse of City funds at issue here was occurring. In light of these facts, I conclude as a matter of law that Knopf's First Amendment right to speak as a citizen on a matter of public concern—the possible misuse of City money—outweighed the City's interest in efficient government.

**B. <u>Garcetti/Pickering</u> steps four and five**

While the first three <u>Garcetti</u>/<u>Pickering</u> inquiries involve legal conclusions for the court, steps four and five instead involve questions of fact. <u>See</u> <u>Helget</u>, 844 F.3d at 1222. Step four requires a determination of whether the protected speech was a motivating factor in the adverse employment decision, while step five asks whether the employer would have reached the same adverse employment decision absent the government employee's protected speech. <u>See</u> <u>id.</u> at 1221. Here, the district court determined that Knopf had sufficient evidence to permit a reasonable jury to find for him on both of these questions. We lack jurisdiction, in this interlocutory appeal from the denial of qualified immunity, to review the district court's determinations as to the sufficiency of the evidence on these two questions. <u>See</u> <u>Johnson v. Jones</u>, 515 U.S. 304, 307, 313 (1995).

Therefore, I conclude, as the district court did, that Knopf sufficiently established a First Amendment claim that, on the merits, was sufficient to survive the Mayor's

7

summary-judgment motion. The qualified-immunity question, which I address next, is whether Knopf's claimed First Amendment violation was clearly established at the time the Mayor refused to reappoint Knopf City planning director.

## III. For qualified-immunity purposes, this First Amendment violation was clearly established when the Mayor declined to reappoint Knopf as City planner

Even if a reasonable jury could find that the Mayor violated Knopf's First Amendment rights, the Mayor is entitled to qualified immunity and, thus, will not be liable for damages, unless the First Amendment right the Mayor violated was clearly established at the time he refused to reappoint Knopf City planner. See Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018). Generally, "[i]n this circuit, to show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Farrell v. Montoya, 878 F.3d 933, 937 (10th Cir. 2017) (internal quotation marks omitted). This clearly-established inquiry again requires consideration of the five Garcetti/Pickering factors.

### A. Garcetti/Pickering step one qualified-immunity analysis: It would have been clear to a reasonable person in the Mayor's position that Knopf's email was outside the scope of his government job duties

Although, as just mentioned, ordinarily to defeat a qualified-immunity defense, the plaintiff must identify a case clearly establishing the unconstitutional nature of the defendant government official's challenged conduct, I would not require, as the majority does, that Knopf locate a factually on-point case clearly establishing that a city department head, like Knopf, would be acting outside the scope of his job duties,

8

analogous to Knopf's employment responsibilities, if he sent an email to the City attorney, a co-equal city department head, complaining about the misuse of city money in a development project that the person in Knopf's position was not overseeing. The fact of the matter is that a senior government employee will rarely, if ever, be able to find such a close factually analogous prior case addressing whether a person with his same job title and responsibilities, employed by the same employer or one with a closely similar job description and employment duties and reporting responsibilities, engaging in the particular speech at issue, was acting outside the scope of his or her official or ordinary job responsibilities as those job responsibilities were both legally and factually applied to this particular plaintiff. Even if a plaintiff-employee could somehow find a prior case addressing the job responsibilities of his exact or closely comparable government position, whether speech undertaken in a particular case fell outside his job duties as applied would still turn on myriad details unique to a given case—including not only the plaintiff-employee's (1) official job duties, but also (2) the informal customs developed around the performance of those duties and (3) further nuances involving, for example, the plaintiff-employee's understanding from his supervisors of how and what exactly the plaintiff's job entails in the particular factual scenario presented. It will be virtually impossible for any plaintiff-employee to find such a closely analogous prior Supreme Court or Tenth Circuit case, unless the prior case happened to involve this same plaintiff or, at the very least, involved another employee of the same government employer with a similar job description who chose a closely similar route to protest a similarly serious transgression of government law and ethics. That is just not a realistic possibility. To

9

require the plaintiff to find such a directly analogous prior case would essentially grant all government employers qualified immunity on any employee's First Amendment claim at the first Garcetti/Pickering prong before even getting to the substance of the alleged wrongdoing. It is not surprising, then, that Knopf could not cite to any prior Supreme Court or Tenth Circuit case with closely analogous facts addressing whether a government employee was acting outside the scope of his job duties. That should not be fatal to Knopf's First Amendment retaliation claim.

Nor do I think such a close factually analogous case is required at this first step in the Garcetti/Pickering analysis. The usual qualified-immunity inquiry—asking whether "at the time of the [official's] conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful," Wesby, 138 S. Ct. at 589 (internal quotation marks omitted)—focuses on the defendant government official's conduct. In contrast, the inquiry at the first step of the Garcetti/Pickering analysis focuses instead on whether the plaintiff-employee's speech fell within that employee's job duties. That question presents a legal determination. Although the second and third Garcetti/Pickering inquiries are also legal questions, this first prong presents a very different inquiry. See Helget, 844 F.3d at 1221-22. That first inquiry may turn, at least in part, on legal authorities such as government regulations or job descriptions setting forth the employee's job responsibilities and authority to act for his government employer.

To remain true to the purpose of the qualified-immunity analysis, of course, it must be clear to a reasonable person in the defendant government official's position that

10

the plaintiff-employee was acting outside his job duties. But who better to make that determination, which is typically a sui generis legal question, see id. at 1222, than the court in the unique context of the case before it?

The Supreme Court has set forth governing principles to guide the determination of whether an employee's speech clearly fell outside the scope of his official or ordinary duties, but at the same time the Court has made it clear that this inquiry does not involve per se rules. Those principles indicate, for example, that it is not dispositive that the employee's speech concerned the subject matter of the plaintiff's employment or involved information that the plaintiff obtained as a result of his public employment or was expressed inside, rather than outside, his office. See Lane, 134 S. Ct. at 2379; Garcetti, 547 U.S. at 424. Nor is it dispositive that the employee engaged in the speech at issue while undertaking a duty listed in his written job description; a government employer cannot "restrict employees' rights by creating excessively broad job descriptions." Garcetti, 547 U.S. at 424. To the contrary, the fact that the government employee was speaking, as Knopf was here, through means available to other citizens can suggest that the employee is speaking as a citizen, outside his job responsibilities. Id. at 423-24. The relevant inquiry "is a practical one." Id. at 424.

I would apply these clearly established general principles to determine, at the first Garcetti/Pickering inquiry, whether it was clear that the government employee's speech fell outside his job duties, instead of requiring the employee to find a close factually analogous Supreme Court or Tenth Circuit case to establish that the particular employee

11

at issue was acting outside the scope of his job duties when engaging in the particular speech that was the basis for the discipline or discharge.

Other circuits, though not directly addressing my point, have also taken a more general approach in addressing whether it is clearly established that a government employee was speaking outside his job duties in a particular case instead of requiring the employee to identify a case directly on point factually. See Anderson v. Valdez, 845 F.3d 580, 592-602 (5th Cir. 2016); Ricciuti v. Gyzenis, 834 F.3d 162, 168-70 (2d Cir. 2016); Carollo v. Boria, 833 F.3d 1322, 1334-35 (11th Cir. 2016).[3] In Carollo, for example, the Eleventh Circuit relied upon the Supreme Court's decisions in Garcetti and Pickering to establish clearly that a government employee "violates the First Amendment [by] terminat[ing] a colleague in retaliation for speaking about matters of public concern that are outside the scope of his ordinary job responsibilities." 833 F.3d at 1134 (citing Eleventh Circuit cases also relying on Garcetti and Pickering for clearly established law). Similarly, the Fifth Circuit in Anderson held that Garcetti, and Fifth Circuit cases

---

[3] To be sure, the Supreme Court has frequently addressed qualified immunity, imploring courts not to conduct the inquiry into whether a constitutional violation was clearly established at too general a level. See, e.g., Wesby, 138 S. Ct. at 590. The Court has indicated that this is particularly necessary in the Fourth Amendment context, where "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). But the first prong of the Garcetti/Pickering inquiry, applicable to a First Amendment violation, presents a very different question, focusing not so much on the defendant government official's conduct but more on the plaintiff-employee's ordinary job responsibilities. That question is typically not well-suited to require a close factually analogous prior case clearly establishing specifically that the plaintiff-employee's speech occurred outside his job duties.

12

applying Garcetti, clearly established that at the time the events at issue in that case occurred, the First Amendment protected a government employee's speech, made outside his chain of command and outside his job duties. 845 F.3d at 600-02. In Ricciuti, the Second Circuit held Garcetti and prior Second Circuit cases clearly established that the plaintiff government employee "could not be fired simply because her speech owed its existence to her employment." 834 F.3d at 169. None of these cases went further and required the plaintiff to identify a prior factually analogous case that clearly established that an employee with the same job duties as the plaintiff, and who spoke in the same manner as the plaintiff spoke under the same circumstances, was speaking outside the scope of his or her job duties. See Anderson, 845 F.3d at 600-02; Ricciuti, 834 F.3d at 169-70; Carollo, 833 F.3d at 1134. These cases, then, in asking whether it was clearly established that the plaintiff government employee in a given case was acting outside the scope of his job duties, focused only on prior cases addressing what a court should consider in making that determination, instead of looking for a factually analogous prior case.

Here, as in these other cases, it was clearly established at the time that the Mayor declined to reappoint Knopf that a government employee's speech made outside the scope of his job duties was protected by the First Amendment. And the Supreme Court's clearly established principles for making that determination, set forth in Garcetti and Lane and applied by prior Tenth Circuit cases, provide sufficient guidance for us to determine whether it was clear to a reasonable government employee that the plaintiff employee's speech was constitutionally protected because it fell outside his job duties.

13

That was enough to satisfy the first <u>Garcetti</u>/<u>Pickering</u> inquiry under the qualified-immunity analysis.

Applying these clearly established principles here, then, it would have been clear to a reasonable person in the Mayor's position that Knopf sent his email outside the scope of his job duties. The Mayor would, or should, have been aware that Knopf had no official duties as to the phase of the greenway development project that was the subject of the email, and that he did not have general oversight responsibilities for the department head involved in that phase of the project. The Mayor also would, or should, have been aware that Knopf sent the email to someone outside Knopf's chain of command, the City attorney. In fact, this was one of the Mayor's primary complaints about Knopf's email, that it bypassed the Mayor, who was Knopf's supervisor. Moreover, the Mayor would, or should, have been aware that any citizen with concerns over the misuse of City money in the greenway development project could have sent such an email to the City attorney expressing those concerns. Further, the Mayor knew or should have known that the underlying allegations of financial favoritism had been discussed at a public city council meeting. The facts that Knopf did not make his concerns public and that the email concerned information that Knopf may have acquired because of his government job do not preclude the conclusion that sending that email was outside the scope of Knopf's job duties.[4]

---

[4] <u>Lincoln v. Maketa</u> —F.3d.—, 2018 WL 443394, at *3-*4 (10th Cir. Jan. 17, 2018), does not contradict application of these general principles to determine whether the plaintiff-employee's speech at issue here fell outside his job duties. In <u>Lincoln</u>, the head of a sheriff's office's internal affairs division, Lt. Peck, alleged that her employers, the sheriff

14

**B. <u>Garcetti</u>/<u>Pickering</u> steps two through five qualified-immunity analysis: The claimed First Amendment violation here was clearly established at the time the Mayor refused to reappoint Knopf City planner**

As for the rest of the <u>Garcetti</u>/<u>Pickering</u> factors, inquiries two through five do address the defendant government official's challenged conduct (as opposed to the first factor, which addresses the legal scope of the government employee's job duties).[5]  I agree that, to be clearly established as to these factors two through five, there must be a prior Supreme Court or Tenth Circuit case or a preponderance of other cases in outside jurisdictions factually analogous to the situation the Mayor encountered here and that

---

and undersheriff, retaliated against Peck after they ordered her to speak to the media and give the media a false report, but Peck instead spoke to the media and told the truth.  <u>Id.</u> at *1.  Based not on the description of her job duties, but instead on relevant case law, this court held at the motion-to-dismiss stage of that case that, for two reasons, Peck had failed to allege that it was clearly established that she was speaking outside her official duties."  <u>Id.</u> at *2.  First, although Peck alleged that speaking to the media was not part of her job duties, that was not the dispositive legal question because, as a matter of case law, speech can be "considered official even when it concerns an unusual aspect of an employee's job that is not part of his everyday functions."  <u>Id.</u> at *4 (internal quotation marks omitted).  Second, Peck was specifically ordered to speak to the media about the matter in dispute and, in doing so, to give a false report.  <u>Id.</u>  Peck argued that because she disobeyed this direction, she was not speaking as part of her official duties.  <u>Id.</u>  "In some circuits," there is case law holding that an employee's "disobedience might affect whether she was speaking as part of her official duties."  <u>Id.</u>  But because the Tenth Circuit has never addressed that legal question, such a legal principle was not clearly established in this circuit.  <u>Id.</u>  <u>Lincoln</u> thus involved a very different legal determination than the question presented here.

[5] Citing a Fourth Amendment case, the majority opinion, at 20-21, indicates that we always consider the plaintiff's, as well as the defendant's, conduct in performing the qualified-immunity analysis.  But here, in the context of a First Amendment retaliation claim, the Tenth Circuit has designated a separate prong of our five-part analysis specifically to considering whether the <u>plaintiff's</u> speech fell within or without the plaintiff's job duties.  Further, the majority opinion relies solely on that prong to deny Knopf's damages claim.

previously had held that conduct similar to the Mayor's conduct violated a government employee's First Amendment right to free speech. Following the Supreme Court's clearly-established inquiry in Lane, then, "[t]he relevant question [here] for qualified immunity purposes is this: Could [the Mayor] reasonably have believed, at the time he" declined to reappoint Knopf as City planner, "that a government employer could" decline to reappoint an employee because of the email Knopf sent the City attorney, a communication that fell "outside the scope of his ordinary job responsibilities." 134 S. Ct. at 2381. I conclude that an objective person in the Mayor's position, "looking at the entire legal landscape," Wesby, 538 U.S. at 593, would have concluded that the City could not fire Knopf for the email he sent the City attorney.

Like the district court, I rely as a starting point on Dill v. City of Edmond, 155 F.3d 1193 (10th Cir. 1998).[6] In Dill, a detective assigned to a murder investigation, Dennis Dill, came to believe that the wrong person had been charged with the murder. Id. at 1200. After he declined to write a false report in the case, Dill was removed from the investigation and transferred to the patrol division. Id. Even so, several months later

---

[6] The majority discounts Dill because the Tenth Circuit decided it before the Supreme Court's decision in Garcetti. In fact, the cases I conclude clearly establish the First Amendment violation at issue here were all decided prior to Garcetti. But Garcetti added only the first inquiry to the Garcetti/Pickering analysis—whether the employee's speech fell outside his job duties. My conclusion, that an employee is not required to identify a close factually analogous prior case that clearly established that the employee's particular speech fell outside the employee's precise job duties, eliminates the majority's concern with relying here on pre-Garcetti case law. That is consistent with the Supreme Court's clearly-established analysis in Lane, which conducted that analysis by relying only on pre-Garcetti decisions from the relevant circuit. 134 S. Ct. at 2381-83. In light of the Supreme Court's qualified-immunity analysis in Lane, I also rely on pre-Garcetti cases here.

16

Dill wrote a letter to the chief of police "stating that [Dill] was aware of exculpatory evidence in the . . . case which he wanted to bring to the attention of the district attorney." Id. at 1200-01. Several months after he sent that letter, Dill was assigned to work weekends and, although he was eventually transferred back to the detective division, he was never assigned another murder case. Id. at 1201.

The Tenth Circuit held, at the motion-to-dismiss stage of that case, that Dill had alleged a First Amendment violation. Id. at 1201-03. Specifically, this court held that Dill's speech was on a matter of public concern—wrongdoing on the part of the City's police officers investigating the murder. Id. at 1202. Dill continued to express his opinion even after he had been removed from the investigation and no longer had any official duties as to that investigation. Id. "The fact that [Dill] chose a private forum within the police department and the district attorney's office, rather than a public forum, does not remove the speech from First Amendment protection." Id. Further, Defendants in that case, in support of their motion to dismiss, failed to assert that Dill's speech had disrupted the operation of the police department. Id. at 1203. Based on these facts, the Tenth Circuit held that Dill had alleged a First Amendment violation (and that that violation was, at the time of the challenged conduct, clearly established). Id. at 1203-05.

Analogous to the case at issue here, then, the Tenth Circuit in Dill held that retaliatory adverse employment action short of termination could support a First Amendment violation; and an employee's speech, made through internal City channels and regarding alleged wrongdoing within the City, based on information the employee discovered during the course of his work, was protected by the First Amendment.

17

The Tenth Circuit's prior decision in Considine v. Board of County Commissioners, 910 F.2d 695 (10th Cir. 1990), is also factually similar to the facts at issue in this appeal. Similar to Knopf, the plaintiff government employee in Considine was the County's director of community and recreational resources, which included "authority over the county's waste management, building inspections, planning department, golf course, regional park, extension service office and economic development." Id. at 696. Considine claimed the County fired him for his protected speech—statements Considine made about a variety of County projects to the County Commissioners, other county officials, and the media. Id. at 697-99. Those statements involved "numerous statutory and regulatory public health and safety violations . . . occurring on projects that were sponsored by the county . . . [,] were under the direction of the county's elected officials and administrative staff"; and "suggested, if true, the county institution was not 'properly discharging its duties.'" Id. at 700. While Considine made some of these statements in the course of his official duties, other statements fell outside those duties. Id. Like Knopf, Considine "communicated his concerns directly to persons and organizations outside the normal chain of command of his workplace." Id. The Tenth Circuit upheld denying the defendant county officials summary judgment and qualified immunity on Considine's First Amendment claim, concluding Considine's statements were on matters of public concern and the defendants had not presented sufficient evidence to tip the balance of the weight of Considine's First Amendment free-speech interests against the weight of the government employer's interest in effective government in the government's favor. Id. at 700-02. Considine, then, clearly

18

established that a government employer violated its high level employee's First Amendment rights when it retaliated against the employee for speech that raised the possibility of wrongdoing by government officials through both internal and public channels.

Another case analogous to ours is <u>Conaway v. Smith</u>, 853 F.2d 789 (10th Cir. 1988) (per curiam). In <u>Conaway,</u> a city's electrical inspector, Clyde Conaway, alleged that the city fired him in retaliation for his reporting his supervisors' wrongdoing. <u>Id.</u> at 790-91. At the summary-judgment stage of that case, the Tenth Circuit held that these allegations, supported by evidence, were sufficient to establish a First Amendment violation against a summary-judgment motion. <u>Id.</u> at 795-99. <u>Conaway</u> reiterated that a government employee's protected speech about wrongdoing on the part of city officials is a matter of public concern. <u>Id.</u> at 796-97. <u>Conaway</u> further held that the electrical inspector's interest in speaking about such wrongdoing, as a whistleblower, outweighed the City's interest in avoiding disruption to City operations. <u>Id.</u> at 797-99. <u>Conaway</u> also held that the electrical inspector in that case, like Knopf here, minimized any disruption to the government workplace by asserting his complaints internally, rather than in a public forum. <u>Id.</u> <u>Conaway</u>, then, clearly established that the fact that there might have been some disruptive effect on the city operations cannot preclude Knopf's First Amendment claim. Further, <u>Conaway</u> clearly established that reporting this possible

19

abuse through internal, rather than public, complaints tilts the <u>Pickering</u> balance toward the employee.[7]

In light of these prior Tenth Circuit cases, a reasonable person in the Mayor's position would have realized, at the time the Mayor refused to reappoint Knopf City planner, that the City could not do so based on the email Knopf sent the City attorney, which was speech protected under the First Amendment.

**IV. Conclusion**

For these reasons, then, I conclude, contrary to both the majority and the concurrence, that Knopf has established a First Amendment violation of his right to free speech sufficient to defeat summary judgment, has shown that it was clear to a reasonable person in the Mayor's position that Knopf's email fell outside the scope of Knopf's ordinary job responsibilities, and that the First Amendment violation was otherwise clearly established at the time the Mayor refused to reappoint Knopf City planning director. On that basis, I would affirm the district court's decision to deny the Mayor's summary judgment motion asserted he is entitled to qualified immunity.

---

[7] I rely on <u>Dill</u> because the district court relied upon it. I rely on <u>Considine</u> and <u>Conaway</u>, even though Knopf does not point us to those cases, as is his burden, to complete this legal analysis and reach the correct conclusion.